John W. WHITTLESEY, Plaintiff,

v.

The UNION CARBIDE CORPORATION,
Defendant.

No. 82 Civ. 4401(PNL).

United States District Court,
S.D. New York.

July 15, 1983.

As Amended July 29, 1983.

Vladeck, Waldman, Elias & Engelhard, P.C., Judith P. Vladeck, Joseph J. Garcia and Anne C. Vladeck, New York City, for plaintiff.

Kelley, Drye & Warren, Eugene T. D'Ablemont, Robert L. Haig and Ned H. Bassen, New York City, for defendant.

## OPINION AND ORDER

LEVAL, District Judge.

The Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 *et seq.*, was amended in 1978 to raise the age of permissible compulsory retirement from 65 to 70. P.L. 95–256, 92 Stat. 189. The amendment carried an exemption permitting the compulsory retirement at 65 of employees who were entitled to a specified level of retirement benefits and who for two years prior to retirement were "employed in a bona fide executive or a high policy making position . . . ." Section 12(c)(1), 29 U.S.C. § 631(c)(1).

This case is among the first to test the scope of the exemption. The employer is Union Carbide Corporation, one of the largest corporations in the nation. In 1981, Union Carbide gave notice to John Whittlesey that upon reaching his 65th birthday he would be compulsorily retired under the provisions of the exemption. Whittlesey, who had been employed at Union Carbide as an attorney since 1953, held the position of Chief Labor Counsel. He advised his superiors that he did not believe he came within the statutory exemption for bona fide executives and high policymakers. Carbide adhered to its position. Shortly before the date of his mandatory retirement, Whittlesey brought this action to enjoin the company from forcing his retirement.

Initially he brought on an application for a preliminary injunction. I denied a preliminary injunction on July 22, 1982, primarily because there was no showing of irreparable harm, there being no proof that other employment was not available to him. His compulsory retirement became effective on September 1, 1982.

Trial was conducted from January 25 to February 9, 1983. The testimony was heavily laden with characterization. Plaintiff described himself as a lawyer rather than an executive or policymaker. He described his functions as primarily giving advice on the requirements of law, handling arbitrations, overseeing or keeping track of litigations and certain administrative matters. He minimized the importance of his supervisory responsibilities over the four more junior lawyers in the Labor Section of the Law Department; he stated that beyond advising on the applicability and interpretation of laws, he had little impact on the formulation of policy at Union Carbide. The witnesses for Carbide characterized his role otherwise, contending that he played a very important role in the formulation of company labor and employee-safety policy and that his supervisory responsibilities over the Labor Section were substantial.

The documentary evidence was voluminous. Carbide offered countless letters or memoranda prepared, drafted, signed or reviewed by Whittlesey, or addressed or copied to him, that expressed any concern with matters of "policy," as well as administrative vouchers, reports and the like arguably proving duties of oversight within the Labor Law Section.

Whittlesey also relied on voluminous documents, often the same ones, stressing passages that supported the inference that his role was limited. Both sides referred to charts of corporate structure, job descriptions, pay rates and the like.

### I.

The job of Chief Labor Counsel is one which might fall on either side of the exemption, depending on the functional role accorded to the position within the particular organization. It is possible to imagine a Chief Labor Counsel, particularly in a large labor intensive company, exercising important executive and policymaking responsibilities. This was the job which Carbide's witnesses sought to describe as Whittlesey's. It is also easily possible to imagine a Chief Labor Counsel who acts primarily as a lawyer, whose executive responsibilities are minor and who does not exert an impact on company policy, as envisioned by the statutory exemption. That was the job Whittlesey's testimony described.

I have found the characterizing testimony of relatively little value on both sides. However the voluminous evidence has drawn a reasonably complete portrait of the attributes of the Chief Labor Counsel at Union Carbide. I find that the evidence clearly demonstrates this is not a "bona fide executive" position or one of "high policymaking" within the meaning of the statute. The functions accorded to John Whittlesey's position over the last years by the Union Carbide management do not come close to those described in the exemption. The evidence showed that Whittlesey as Chief Labor Counsel had little executive responsibility and that this aspect of his work occupied a very small percentage of his time, by far the greater part of which was devoted to doing lawyers' work. He also did not meet the qualification of "high policymaker". Although it is clear that the advice he gave extended beyond mere interpretation of legal requirements and did touch on questions of policy, he was not looked to for significant contributions to the formulation of policy at Union Carbide. Whittlesey has demonstrated by clear convincing proof that Union Carbide violated the Age Discrimination in Employment Act by subjecting him to compulsory retirement at the age of 65.

The interpretive regulations promulgated by the Equal Employment Opportunity Commission (EEOC) include discussion of both "bona fide executive" and "high policymaking position". 29 C.F.R. § 1625.12 (1979). The regulations adopt and incorporate considerable material from the Conference Committee Report. H.Conf.Rep. No. 950, 95th Cong., 2d Sess. 8–10 (1978) *reprinted in* 1978 U.S.Code Cong. & Adm. News 504, 528, 530–31.

*Bona Fide Executive*

As to the exclusion for a "bona fide executive," the Regulation states in (d)(1) that:

the employer must initially show that the employee satisfies the definition of a bona fide executive set forth in § 541.1 of the regulations under the Fair Labor Standards Act. Each of the requirements in paragraphs (a) through (e) of § 541.1 must be satisfied, regardless of the level of the employee's salary or compensation.

29 C.F.R. § 541.1, to which the Conference Committee had referred as a guideline, defines the term bona fide executive for purposes of exemption from the wage and hour provisions of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 213(a)(1). Paragraphs (a) through (e) of § 541.1 describe an employee whose primary duty consists of the management of the enterprise or a department or subdivision; who regularly directs the work of two or more other employees; who has the authority to hire and fire or whose suggestions and recommendations on hiring, firing, and promotion are given particular weight; who customarily exercises discretionary powers; and who does not devote more than 20% of his time to activities other than those specified above.[1]

The EEOC Regulation continues, however, in Paragraph (d)(2) to make clear that meeting § 541.1(a)–(e) of the FLSA Regulations is not sufficient. The employee must also come within descriptive criteria elaborated in the Conference Committee Report designed to make clear that the exemption applies "only to a very few top level employees who exercise substantial executive authority over a significant number of employees and a large volume of business." § 1625.12(d)(2). Or,

[w]ith respect to employees whose duties are associated with corporate headquar-

---

1. Defendant asserts that the EEOC Regulations improperly omit reference to the short form alternative test for executive status contained in the proviso to 29 C.F.R. 541.1(f). In the first place there is no basis for defendant's argument that the EEOC lacked authority to construe the statute as it did in promulgating regulations. Second, the allusion of the Conference Committee is followed by the express statement that the ADEA exemption is to be construed more narrowly than the FLSA exemption. In any event, the FLSA criteria are only the first step in the inquiry under the ADEA exemption, and, as ensuing portions of this opinion show, plaintiff is not within the further criteria.

ters operations, such as finance, marketing, legal, production and manufacturing (or in a corporation organized on a productline basis, the management of product lines), the definition would cover employees who head those divisions.

In a large organization the immediate subordinates of the heads of these divisions sometimes also exercise executive authority, within the meaning of this exemption. The conferees intend the definition to cover such employees if they possess responsibility which is comparable to or greater than that possessed by the head of a significant and substantial local operation who meets the definition.

29 C.F.R. § 1625, 12(d)(2), *quoting* H.Rep. 95–950 at 9.

The evidence showed that Whittlesey's job came within neither the precise definitions of the FLSA Regulations § 541.1(a)–(e), nor the broader descriptions of a bona fide executive imported from the Conference Committee Report. He was primarily an attorney doing legal work, giving legal advice, giving attention to the effect of statutes, regulations and administrative action upon company practices, and attending to litigation.

He was indeed the senior attorney in the Labor Law Section and, as such, had some administrative or executive responsibility over the functioning of this small section. But his supervisory duties were quite minimal and occupied a very small portion of his time. For example, Whittlesey did not exercise responsibility for the assignment of work within his section. He did not supervise the other attorneys in their work, excepting a new and relatively inexperienced attorney. He did not decide, or exert a particularly strong influence over decisions on hiring, promotion or salary. He did not supervise the retention of outside counsel for litigated matters. And he did not exercise control over the most important matters in the Labor Section; the attorneys in the Labor Section generally received matters directly from "clients," i.e. managers or

executives in operating divisions of the corporation, and worked on those matters generally without supervision (except in the case of an inexperienced lawyer).

The administrative chores which came within his responsibility included the preparation of certain summaries, periodic reports and projections of travel and litigation expenses; they were of trifling importance.

Whittlesey does not fit the further criteria of the Regulation, quoted from the Conference Committee Report, designed to deal with headquarters departments. He is not the "head" of the legal department, nor is he "the immediate subordinate" of the head who "in a large organization . . . sometimes also exercise[s] executive authority . . . ."

His position was at a considerable remove from the top of the Law Department. In that department it was shown that eight attorneys, including 3 Assistant General Counsel, reported directly to the General Counsel. Each of the Assistant General Counsel were reported to by a number of lower level attorneys at or around Whittlesey's level. In the case of Whittlesey's segment of the Department, six attorneys reported to Assistant General Counsel Doan who was among eight reporting directly to the General Counsel. (Exhibit 374; Stipulated Fact No. 8)

Nor is he on a par in the exercise of executive authority with the heads of "significant and substantial local or regional operation[s] . . . ." § 1625.12(d)(2). The title of his position had been Senior Labor Counsel until 1977 when it was changed to Chief Labor Counsel. It appears that the former title better described the responsibilities of the position. This is not to deny that he exercised some administrative authority over the small number of less senior labor lawyers in his section. It is rather to underscore the point that Whittlesey was above all an in-house lawyer specialized in labor law matters, and that his slight administrative duties over four other labor attorneys were relatively minor and not of

the kind described or envisioned in the statute and regulations as "bona fide executive".

### High-Policymaking Employee

An in-house lawyer specializing in the field of labor relations in a large labor-intensive manufacturing corporation might be expected to fit more comfortably within the high-policymaking exemption. As the defendant argues, labor policies and practices are certainly of great importance to such a company, and the chief labor law specialist is potentially well placed to exercise an important influence on the making of such policy.

The discussion of high policy making positions set forth in the EEOC Regulation, quoting from the Conference Committee Report, states that these positions are "limited to ... certain top level employees ... 'whose position and responsibility are such that they play a significant role in the development of corporate policy and effectively recommend the implementation thereof.'" 29 C.F.R. § 1625.12(e), *quoting* H.Rep. 95–950 at 10, U.S.Code Cong. & Admin.News, p. 531.

The examples given are of a chief economist or chief research scientist, whose

> responsibility would be to evaluate significant economic or scientific trends and issues, to develop and recommend policy direction to the top executive officers of the corporation and [who] would have a significant impact on the ultimate decision on such policies by virtue of his expertise and direct access to the decisionmakers.

*Id.*

Carbide contended that Whittlesey fit this description, but the evidence showed that he did not.

Whittlesey's potential impact as an advisor on policy was quite modest. He had virtually no access to the high policy making levels of management. He did attend meetings of certain committees which were concerned with recommending policy in the areas of safety and employee relations, but his attendance was primarily for the purpose of furnishing legal advice to these committees. Union Carbide did not encourage or invite its house lawyers to play a dynamic policy-creating role in those circumstances. Indeed in 1979, Whittlesey's boss, Assistant General Counsel Robert Doan, had circulated a memorandum instructing Whittlesey and others that they were employed to do legal work and should make it clear when invited to attend the meetings of such committees that they were there for that limited purpose. (Exhibit 15; *see* Exhibit 32 at 20).

Although several Carbide witnesses testified to the conclusion or characterization that Whittlesey played an important role in the development of policy, no convincing examples were given. The policy matters mentioned in their testimony often pertained to matters of smaller importance than envisioned by the ADEA exemptions; more significantly, Whittlesey was rarely shown to have played any major or large role in their development. It is true as Carbide contends, that Whittlesey's work occasionally dealt with matters of company policy.[2] It was not limited to advising on what the laws did or did not require, but included also from time to time expressing opinions on what would be a wise, efficacious or desirable procedure or policy. Carbide showed without question that Whittlesey played some role, sometimes in drafting, sometimes in commenting on, memoranda or letters which dealt with issues of corporate policy. It was also shown that Whittlesey (from time to time) attended meetings of committees concerned with policy.

My finding is not that Whittlesey played no role in recommending corporate policy. It is rather that he did not play a signifi-

---

**2.** I also accept without question Carbide's contention that "policy" as used in the statute refers broadly to company attitudes, procedures, approaches, etc., and not merely to a narrow set of top level written management policies.

cant policy role or the kind of role envisioned by the statute and the regulations as a basis for exemption. His role in connection with policy formulation was minor.

Congress might easily have taken a different approach. Recognizing the importance of avoiding staleness in the formulation of policy, Congress might well have excluded all positions which contribute in any meaningful way to the formulation of company policy. If this were the standard, Whittlesey's position might well come within it. But the standard is far more restrictive, and extends the protection from age 65 compulsory retirement to many employees who have some involvement in policymaking but who do not qualify as "top level employees ... [who] play a significant role in the development of corporate policy and effectively recommend the implementation thereof."

I accept the validity of Carbide's argument that an unresourceful employee should not benefit in this regard from his failure to perform adequately the duties that are expected of him. If the responsibilities of the job included the shaping of company policy, an employee would not escape the exemption because his lack of energy, imagination or judgment had prevented him from realizing the goal. In this case, however, it is not a matter of Whittlesey's having failed to perform high level policymaking functions which were expected of him. No dissatisfaction ever was expressed with the manner in which he carried out his duties. I find that the policy level management of Union Carbide did not endow the job of Chief Labor Counsel with "high policymaking" responsibilities or opportunities.

*Level of Compensation and Inclusion in the Incentive Plan*

Union Carbide seeks to justify Whittlesey's exemption by his high pay and by the procedures Carbide used to determine which employees came within the exemption.

Since 1974 Carbide has utilized an annual plan under which incentive bonuses are paid to management personnel. Guidelines for the determination of eligibility (Exhibit 1295) have been promulgated from year to year without substantial change. The functional qualifications are as follows:

(a) The position reports to a position which is included in the Annual Incentive Plan.

(b) The position has a significant impact on the performance of a Division, an Area, or the Corporation.

(c) Normally positions recommended for this plan should be Grade 19 or higher.

Exhibit 1295. The "Grade 19" qualification refers to the Hay grading system for executive compensation. Whittlesey's position carried a Hay pay grade of 21.

In the fall of 1978, after the passage of the amendment to ADEA, the Compensation Committee of the Board of Directors met to consider new compulsory retirement policies necessitated by the change of law and resolved to recommend to the Board that "to the extent permitted by law, the mandatory retirement age for executive and high policymaking employees ... shall continue to be 65 ...." This recommendation was accepted by the Board of Directors.

During 1979 the question how to identify employees subject to compulsory retirement at 65 under the exclusion was studied by a Carbide attorney named J.P. Klein, Esq. A determination was made that all persons included in the Annual Incentive Plan would be considered subject to retirement at 65 under the ADEA exemption.

At the time of this determination, Whittlesey's position of Chief Labor Counsel was not included in the Annual Incentive Plan. In 1980, the General Counsel Mr. Stichnoth was advised that virtually every grade 20 or 21 employee in the corporation was in the Plan except for 14 persons in the Law Department. It was suggested that the Law Department should be brought into conformity by including such higher paid personnel in the plan. Mr. Stichnoth then rec-

ommended for the year 1981 that 12 additional Law Department positions of Grade 20 or 21 be included in the Incentive Plan, including the Chief Labor Counsel. Thus for the year 1981, Whittlesey's position was included for the first time in the Plan. When notified of his inclusion Whittlesey observed that he was being fattened up for the kill. And it was not long thereafter on March 16, 1981 that he received a letter advising him that

> Union Carbide's management has concluded that your position meets the criteria established in the [ADEA] exclusion and that therefore you will be expected to retire at the end of the month in which your 65th birthday occurs [August, 1982] . . . .

Exhibit 33.

Union Carbide argues that Whittlesey's high pay grade and his inclusion in the Annual Incentive Plan are valid criteria demonstrating his appropriate inclusion within the excepted category. Its argument is flawed.

Whittlesey's total compensation for 1981 exceeded $100,000, including the amount he received by virtue of inclusion in the Incentive Plan. Carbide contends that his position was among the top 160 in the corporation and that only 154 employees were in grade 21 or higher at the time of his mandatory retirement.[3]

High pay, however, is not determinative as to whether a position comes within the bona fide executive or high policymaker exemption. The test is one of function, not of pay. Pay was rejected as a criterion and was eliminated in conference from the Senate bill.[4] Although I have no doubt that

high or low pay can be relevant, and often compelling evidence, as to an employee's executive or policymaking importance, there are factors in this case that diminish its probative value.

In today's market, lawyers command high fees, and large corporations have substantial need to consult lawyers. The extent to which corporations have legal work done by outside firms and the extent to which they hire staff lawyers to do the work in house varies with the particular corporation's analysis of where its advantage lies. In order to hire and retain competent lawyers to do legal work as salaried employees of the corporation, the corporation must offer them conditions of employment that are competitive with the opportunities available to them in private practice. Carbide's General Counsel Mr. Stichnoth acknowledged for example that in hiring new law school graduates, he was required by market conditions to match the compensation they could command from New York City law firms. He added that he thought this meant a beginning attorney would receive a salary comparable to that of a middle level executive manager of 10 years experience. Tr. 1340 *ff.*, 1462–65. The same considerations are true for senior level attorneys.

Carbide argues that Whittlesey's level of pay supports the conclusion that he must be a high policymaker or bona fide executive. It demonstrates no such conclusion. What it demonstrates is that Carbide's need for attorneys' services is sufficiently important to justify its payment of the fees and salaries which the legal profession of the day is able to command. The salary accorded to Whittlesey's position no doubt measures the importance of that function to Union Car-

---

**3.** Plaintiff contests the reliability of the figures in part because pay grades have overlapping ranges so that it cannot be determined from the information provided by Carbide how many lower grade employees in fact receive higher compensation. This quibble, however, is not the main flaw in defendant's argument.

**4.** The Senate version of H.R. 5383, the bill enacting the ADEA amendments and the exemption, used the phrase "select group of manage-

ment *or highly compensated employees.*" *See* S.Rep. No. 493, 95th Cong., 1st sess. 7–8, *reprinted in 1978* U.S.Code Cong. & Adm.News 504, 510–511. (emphasis added) This language was replaced in conference by the functional terms "bona fide executive or high policymaking position." H.Rep. No. 95–950 at 8–9, U.S.Code Cong. & Admin.News, p. 530.

bide. It does not measure whether the attributes and responsibilities of the position involve executive or high policymaking functions.[5]

In similar fashion, Carbide argues that since there are division managers who unquestionably fall within the language of the Regulation and the Conference Committee concerning "the head of a significant and substantial local or regional operation" who are paid substantially less than Whittlesey,[6] he must also be covered by the exemption. The argument does not follow. Better paid though he be, his better pay does not endow his job with executive or policymaking attributes. The statutory test is not satisfied.

The flaw in Carbide's argument concerning the Annual Incentive Plan is similar. The fact that Union Carbide saw fit to include Mr. Whittlesey's position in the Incentive Plan does not demonstrate that his responsibilities were of the sort that the statute exempts. Indeed Carbide's written criteria for inclusion in the Plan are overtly different from the criteria for the statutory exemption. The functional criteria of the Plan demand that "The position has a significant impact on the performance of a Division, an Area, or the Corporation." Exhibit 1295. This test may be broader in some senses, and in other senses narrower than the bona fide executive/high policymaker tests. What is clear is that it is different. Even if it were the same, it would not necessarily follow that the employer's application of the test would bind the court. But where the test is different, it must of course be the functional analysis of the attributes of the job that controls, and not whether the employer saw fit to include it in an incentive plan.

Furthermore the history of the inclusion of Legal Department positions in the Incentive Plan gives some support to the notion that the high pay of those positions reflected the high market price of attorney's work rather than executive or policy making importance of the position. As noted above, in 1980 virtually all the company's grade 20 and 21 employees were in the Plan except in the Legal Department where many of the lawyers paid at those grades were not included. The failure to include them may well have reflected the fact that their high pay was more a consequence of the market for lawyers' skills than of their impact on company policy.

Carbide further argues that the court has no power to review its decisions as to who, within its organization, falls in an exempted position. By analogy to the business judgment rule, it contends it should have exclu-

---

**5.** Defendant also makes much of a calculation expressed by Senator Pell (D–R.I.) when he introduced the amendment that became the exemption. 123 Cong.Rec. S–17289 (Oct. 19, 1977). Based on language entirely different from that ultimately enacted, Senator Pell figured that 0.42% of retirements in 23 corporations would be within the exemption. Carbide argues that Whittlesey was within a smaller percentage of Carbide retirements. Carbide reads far too much into Senator Pell's figures, which were purely explanatory and based on a different standard applied to other companies. By this argument, Carbide seeks to substitute a fragment of legislative history for the standards adopted by the statute and regulations.

**6.** Documents were offered by defendant intended to prove the lower pay grades of division managers supervising large numbers of employees and assets. Plaintiff's objection to their receipt was sustained because these compilations were prepared for the litigation and,

not within any proper exception to the hearsay rule and, more importantly, because the information was accumulated and presented in a fashion which unfairly denied the plaintiff the opportunity to verify or challenge it, or to offer supplemental explanatory or rebuttal evidence. (Compare Magistrate Tyler's opinion dated January 27, 1983.)

For purposes of argument, however, this decision accepts as true the facts asserted in the unreceived exhibits. *See also* Affidavit of John A. Stichnoth dated July 19, 1982, ¶ 33. Accepting as true Carbide's contention that those division managers supervised very large numbers of employees and operations, came within the executive exemption, and were paid at a lower rate than Whittlesey, this does not affect the conclusions reached in this opinion. Although Whittlesey's pay was higher, he was not an executive or high policymaker because his duties were not those of an executive or high policymaker.

sive prerogative without review by the courts to decide who are its executives and policymakers.[7] There is no indication that the statute or the regulations intended to give management unreviewable discretion to decide whom it could retire at 65 and whom it could not. Since the statute expresses a prohibition against management, it would be odd to confer on management the exclusive power to determine whether the prohibition is applicable.

I would be inclined to agree that if the organizational structure of the enterprise makes clear that the position in question has bona fide executive rank or serves a high policymaking function, courts probably should not allow the occupant to disavow the attributes of his position by seeking to prove, for example, that no one paid attention to his policy recommendations or followed his executive orders. But such considerations are not involved in this dispute. Here is a position as to which the organization charts and job descriptions do not answer the statutory questions. The court must receive proofs as to whether the company endows that position with bona fide executive or high policymaking functions. The evidence in the case showed that it does not. Accordingly the exemption is not available.

I conclude that plaintiff has proved his cause of action and shown wrongful retirement in violation of the ADEA.

## II.

■ Carbide argues nonetheless that Whittlesey should not be reinstated or awarded back pay or future pay for a number of reasons. I find that its contentions are not persuasive.

First, Carbide argues that Whittlesey's actions have lost him the confidence of Car-

bide's management so that he will not be trusted and cannot function as a staff attorney. Second, Carbide argues that misconduct on Whittlesey's part in connection with the litigation warrants his dismissal.

The conduct cited centers on his bringing a lawsuit against his employer, his retaining a law firm which was representing a plaintiff in a race discrimination suit against Carbide, and a claim that he wrongfully took and improperly destroyed or hid Carbide documents for his personal benefit and in disregard of a document demand.

As for the documents, Carbide charges that, in connection with this suit, Whittlesey improperly took some documents home to use against Carbide and discarded or filed others so as to confuse Carbide's efforts to determine what matters he had worked on. No impropriety has been shown. The latter allegation concerns Whittlesey's attempt to clean out his office on his last day of work; the notion that this impeded Carbide's discovery is unsubstantiated. The allegation of unauthorized removal is equally gratuitous. It was shown that Whittlesey returned all of Carbide's documents to its files. That he threw away unneeded extra copies is of no consequence. And to the extent that he kept copies for his personal records, there was no impropriety in his doing so.

Carbide's complaint is a gross exaggeration. There is no showing that any document of interest to Carbide was made unavailable. Nor was there any showing that Whittlesey's actions in this regard were intended to frustrate Carbide's efforts in its litigation against him.

The issue of Whittlesey's counsel calls for some comment. I do agree that there was a mistake of judgment on his part and on the part of his counsel in failing to insure

---

7. This argument would be appropriate if dismissal were found to have been motivated by some good faith nondiscriminatory judgment on the part of management. In such instances, as the cases cited by defendant show, courts will not review the correctness of manage-

ment's bona fide judgment. Here, however, the forced retirement was admittedly on account of age; the judgment whether this was prohibited by law must be evaluated by the court, not by management.

that the matter was discussed openly with Carbide.

When Whittlesey first contacted the Vladeck firm in March, 1981 he was not aware that the firm was acting for the plaintiff against Carbide in a race discrimination suit entitled *Goffe v. Union Carbide,* 79 Civ. 6744 (ADS) (S.D.N.Y.). Whittlesey was aware of the existence of the case and had had limited contact with it. Carbide was represented by outside counsel; Ms. Marguerite Smith, an attorney in Whittlesey's section, supervised the case for inside house counsel. Whittlesey had once been present over a year earlier at a meeting with Carbide's outside counsel at which the Goffe case was discussed, but he had had no further significant involvement. At the time of the first communication by Whittlesey with the Vladeck firm in March, 1981, they did not mention to him their engagement in the Goffe case. Whittlesey did not formally retain the firm until August 27, 1981. At that time Mrs. Vladeck informed him of her engagement in *Goffe.* A few days thereafter on September 4, 1981, the Vladeck firm submitted a charge on Whittlesey's behalf to the EEOC. Whittlesey instructed his subordinate Ms. Smith not to discuss the Goffe case with him, advising her that Vladeck was representing him in his dispute with the company.

Whittlesey assumed that his superiors were aware of his representation by Vladeck because of the firm's submission of his EEOC charge. But an EEOC charge is not signed by counsel. Although the charge was submitted with a Vladeck cover letter, this letter was apparently not transmitted to Carbide by the EEOC.

It appears that Whittlesey's superiors did not learn of his representation by Vladeck until the filing of his complaint in this action in July 1982. Shortly thereafter, in October 1982, Vladeck withdrew from its representation of Goffe.

In my view, all concerned would have been well advised to deal more directly with this cause of concern. I think the Vladeck firm should have advised Whittlesey promptly of its role in *Goffe* when first consulted, rather than wait until they were formally retained several months later. And Whittlesey, when he first learned of the conflict in August 1981, would have been well advised to raise the issue directly with Carbide. To rely as he did on the expectation that Carbide would be aware of it through the EEOC filing and would raise it themselves if they found it a problem was not wise. Serious complications could have resulted if Whittlesey, for the benefit of his own case, had communicated information to his counsel which was helpful to the plaintiff in Goffe.

As an exercise of hindsight, it is easy to conclude that Whittlesey would have been wiser to raise the matter, so as to insure that it would receive whatever attention and discussion it required. His failure to do so, however, was not an effort to deceive or an act of bad faith.

I find that Carbide's insistence on these incidents is more a reflection of Carbide's intense resentment of Whittlesey's bringing the lawsuit than a fair appraisal of their importance as a basis to dismiss him. It was clear beyond doubt that Mr. Whittlesey's superiors were outraged at a senior attorney bringing suit against Carbide and are determined that he should not return to the Law Department. Generally Carbide's representatives displayed outrage and indignation against Whittlesey throughout the suit at every opportunity.[8]

It seems quite clear that Carbide's insistence on its right to fire Whittlesey by reason of his "misconduct" involves an exaggeration of makeweights, the real motive being indignation against him for the suit.

Carbide has failed to prove its contention of a right to fire Whittlesey and a conse-

---

8. The animosity with which the litigation was conducted on Carbide's part by its regular outside counsel was intense and apparent. By way of example, a major part of the efforts of

Carbide's trial counsel was devoted to impassioned but unproductive, time wasting and unsuccessful efforts to impeach Whittlesey.

quent limitation of its liability to the time of the suit. I would have to conclude that such firing would be in bad faith, not justified by the reasons given and, in sum, retaliatory.

## III

I conclude that plaintiff Whittlesey is entitled to judgment in his favor. The scope of appropriate relief, however, is not entirely clear. Section 626(b) of Title 29, U.S.C., governing relief in ADEA cases, incorporates by reference the remedial provisions of the FLSA, 29 U.S.C. § 216(b). Plaintiff is clearly entitled under those provisions to back pay to the date of judgment.

■ Whittlesey contends that he is also entitled to liquidated damages in the amount of his back pay—in short, to a doubling of his damages. Unlike the Fair Labor Standards Act, the ADEA provides for liquidated damages "only in cases of willful violations." Courts have divided on the meaning of "willful" as used in this statute. I agree with Judge Weinfeld's conclusion in *Koyen v. Consolidated Edison Co.,* 560 F.Supp. 1161, 1165 & n. 24 (S.D.N.Y.1983), that, in order to qualify for liquidated damages, a plaintiff "must establish that the [employer] acted with knowledge of the illegality of his action," or at least an inexcusable disregard. Although it is not disputed here that Carbide retired Whittlesey by reason of his age and with knowledge of the statute, there was excusable uncertainty as to the coverage of the new amendment. I find that Carbide's action was not willful within the meaning of the statute and deny the claim for liquidated damages.

Whittlesey also seeks reinstatement. While reinstatement is a conventional remedy in such cases, utilized to redress a wrong and make the plaintiff whole, *see Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975), there seem to be good reasons not to grant it in this case.

Carbide has exhibited such hostility and outrage against him by reason of his bringing the suit, he would certainly have difficulty functioning in the Law Department. By all indications, he would be ostracized and excluded from the functions of giving counsel. Reinstatement into those circumstances does not seem to be an ideal remedy. *See Cancellier v. Federal Department Stores,* 672 F.2d 1312 (9th Cir.), cert. denied, —— U.S. ——, 103 S.Ct. 131, 74 L.Ed.2d 113 (1982); *Hoffman v. Nissan Motor Corp.,* 511 F.Supp. 352, 355 (D.N.H.1981). *Cf. Dickerson v. Deluxe Check Printers, Inc.,* 703 F.2d 276 (8th Cir.1983).

I find no justification for this attitude on the part of Carbide. Whittlesey had every right to claim the protection of an Act of Congress, rather than accept illegal forced retirement. It was also a reasonable step to seek the court's ruling as to whether his position came within the new amendment. Carbide gave him no choice. I would add that he conducted himself in a reasonable and dignified fashion, without unconstructive displays of animosity, throughout the dispute. Although his employer's hostility makes plaintiff's reinstatement difficult, this vengefulness cannot do plaintiff out of his right to adequate relief. If a damage remedy exists under the statute to compensate plaintiff for his future loss up to his permissible retirement at the age of 70, I think it a preferable remedy to reinstatement.

■ Courts have disagreed as to whether the ADEA authorizes a damage remedy for future loss of wages—or "front pay"—as opposed to back pay. Judge Weinfeld reviewed the cases in *Koyen, supra,* 560 F.Supp. at 1167 & n. 33. As usual, I find Judge Weinfeld's analysis powerfully persuasive and conclude like him that such an award is within the court's power "to grant such legal and equitable relief as may be appropriate to effectuate the purposes of [the ADEA]," 29 U.S.C. § 626(b). I adopt the points made in Judge Weinfeld's opinion, 560 F.Supp. at 1167–1169, including his

observation as to the applicability of the plaintiff's duty to mitigate his damages by seeking other employment.

My inclination to deny reinstatement is, of course, dependent upon the existence of the front pay damage remedy. If it were decided by a higher court, upon review, that no such damage remedy exists, I would conclude that the plaintiff is entitled to unhappy reinstatement, as that would be necessary to redress his grievance and to enforce the Act.

I suggest that the parties attempt to settle the appropriate amount of a monetary award under the rulings set forth in this opinion, without waiver of the right to dispute on appeal the principles supporting it. If agreement on numbers cannot be reached, the parties are directed to make submissions supporting their contentions by August 5, 1983.

SO ORDERED.