Barbara B. BUTLER, Plaintiff–
Appellant,

v.

**NEW YORK STATE DEPARTMENT OF LAW, Dennis C. Vacco and William Flynn, Defendants–Appellees.**

No. 98–7616.

United States Court of Appeals,
Second Circuit.

Argued: Feb. 11, 1999.

Decided: May 3, 2000.

Daniel J. O'Donnell, New York, NY, for Plaintiff–Appellant.

Franklyn H. Snitow, Snitow & Cunningham, LLP, New York, NY (Charles D. Cunningham, Richard A. Braunstein, Snitow & Cunningham, LLP, New York, NY, on the brief), for Defendants–Appellees.

Before: VAN GRAAFEILAND and PARKER, Circuit Judges, and MISHLER, District Judge.*

PARKER, Circuit Judge:

Plaintiff–Appellant Barbara B. Butler appeals from a judgment of the United States District Court for the Southern District of New York (Charles L. Brieant, *Judge*), entered on March 27, 1998, granting summary judgment to Defendants–Appellees the New York State Department of Law (the "NYSDL" or the "Department"), Dennis Vacco, and William Flynn (collectively "defendants"). The decision is reported at *Butler v. New York State Dep't of Law*, 998 F.Supp. 336 (S.D.N.Y.1998).

Butler brought a complaint against defendants alleging that she had been fired from her position as a Deputy Bureau Chief of the Litigation Department at the NYSDL in violation of her right to freedom of association[1] under the First Amendment to the United States Constitution and the New York Constitution. In addition, she claimed that defendants fired her because of her age and sex in violation of federal and state employment discrimination statutes. The district court held that Butler could not prevail on her First Amendment free association claim because she was a policymaker and could therefore

---

* The Honorable Jacob Mishler of the United States District Court for the Eastern District of New York, sitting by designation.

1. Although plaintiff includes freedom of speech in the introductory paragraph of her complaint, her claim is only for violation of

her right to freedom of association, in that she was fired because she was not politically affiliated with Vacco. The district court treated the case as such, and Butler does not contest that approach on appeal. Thus, we address only the political affiliation claim.

be fired for reasons of political patronage. Alternatively, the district court held that defendants Vacco and Flynn, individually, were entitled to dismissal on the ground of qualified immunity. The district court also found that Butler had failed to adduce sufficient evidence to establish a prima facie case for her federal law claims of sex and age discrimination. The court also called into question Butler's status as an "employee" entitled to sue under the statutes. Having granted summary judgment to defendants on the federal claims, the district court declined to exercise supplemental jurisdiction over plaintiff's state law claims. We affirm in part and dismiss in part.

## I. BACKGROUND

### A. *Facts*

In 1980 Butler was appointed an Assistant Attorney General ("AAG") for New York State by then–Attorney General ("AG") Robert Abrams. The appointment letter explained that her employment was terminable by the AG at will; she served "at the pleasure of the Attorney General." Butler was hired into the Litigation Bureau (the "Bureau") of the NYSDL's New York office, and promoted to Section Chief in 1981. She was promoted in 1983 to Deputy Bureau Chief. The Litigation Bureau is managed by the Bureau Chief, two Deputy Bureau Chiefs and ten Section Chiefs. Butler assisted in overseeing the Section Chiefs and approximately 112 employees, including 80 attorneys.

A job description for AAGs prepared by Human Resources at the NYSDL states that the responsibilities for the position include "appearing for the Attorney General before State and Federal Courts, preparing, presenting, and arguing cases, examining witnesses, conducting hearings under oath and preparing evidence, briefs and memoranda of law." According to Butler's complaint and her resume, as Deputy Bureau Chief she helped supervise over eighty attorneys, advised attorneys within the Bureau on how to proceed with litigation, reviewed and edited briefs and other court papers, and assigned new cases. Butler also interviewed candidates for the position of AAG, and was consulted regarding promotion of personnel.

Effective January 1, 1995, Dennis Vacco was elected AG of New York. He informed the NYSDL that all AAGs would be required to reapply for their positions. Butler reapplied on January 20, 1995, requesting that she retain her position as Deputy Bureau Chief, but voicing her willingness to take another suitable position within the Department. Butler was interviewed, and later received a letter from Salvatore W. Page, Deputy for Administration, dated June 2, 1995, informing her that she would not be rehired. Although the letter stated that her last day of work would be June 16, 1995, this date was later extended to July 5, 1995.

### B. *Proceedings Below*

On January 25, 1996, Butler timely filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC"), alleging that her employment had been terminated because of her age and sex. She subsequently received a right to sue letter from the EEOC, dated May 1, 1996, indicating that its review of the evidence failed to reveal that discrimination had taken place. Butler filed a complaint in federal district court on July 29, 1996 against the NYSDL, AG Vacco, and First Deputy Attorney General William Flynn. The complaint alleged that the NYSDL discriminated against her on the basis of age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (the "ADEA"), and the New York Human Rights Law (the "NYHRL"), Executive Law § 290 *et seq.*, and on the basis of sex, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the NYHRL. Pursuant to 42 U.S.C. § 1983, Butler also alleged that defendants Vacco and Flynn, in their official capacities, vio-

lated her right to freedom of association under the constitutions of the United States and New York State by firing her because she was not politically affiliated with Vacco or anyone in his political party.

Defendants filed an answer on September 19, 1996, denying the allegations and asserting affirmative defenses. On February 18, 1997, defendants moved for summary judgment pursuant to Fed.R.Civ.P. 56(b), asserting that the individual defendants were entitled to qualified immunity on the constitutional claims, and that Butler was a "policymaker" who could be fired without violating her First Amendment rights and who was statutorily exempt from the protections of the ADEA and Title VII. The district court granted defendants' summary judgment motion in a memorandum and order on March 25, 1998. Judgment was entered for defendants on March 27, 1998.

The district court held that Butler's First Amendment claim failed because she was a policymaker who could be discharged for political affiliation. *Id.* at 339–43. In the alternative, the district court held that Vacco and Flynn were entitled to qualified immunity under *Danahy v. Buscaglia*, 134 F.3d 1185 (2d Cir.1998). *See Butler*, 998 F.Supp. at 338, 343.

Turning to Butler's ADEA and Title VII claims, the court held that Butler had failed to establish a prima facie case of either age or sex discrimination because her evidence failed to demonstrate "that her dismissal occurred in circumstances giving rise to an inference of discrimination on the basis of her age or gender." *See id.* at 344. The court also found that even if Butler had established a prima facie case, her claims would probably still fail because she "seems to fall within the policymaker exceptions to Title VII and the ADEA." *Id.* at 344–45.

In granting summary judgment against Butler, the court noted that although she had no remedy under either the ADEA or Title VII, she could pursue a claim under the Government Employees Civil Rights Act of 1991, 2 U.S.C. § 1201 *et seq.*, which provides for review by the EEOC with a right of direct appeal to the Court of Appeals. Finally, having dismissed Butler's claims under federal law, the court declined to exercise supplemental jurisdiction over her state law claims. *See Butler*, 998 F.Supp. at 346.

## II. DISCUSSION

On appeal, Butler argues that the district court erred in finding that she was a policymaker and therefore not protected by the First Amendment from a dismissal predicated on political affiliation. She also argues that the district court incorrectly held that she failed to establish a prima facie case of age or sex discrimination and erred in finding that she was not an "employee" under the definition set forth in the ADEA and Title VII.

This Court reviews a district court's grant of summary judgment *de novo*. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 764 (2d Cir.1998). We consider the evidence in the light most favorable to the appellant, drawing all reasonable inferences in her favor. Summary judgment is appropriate only in the absence of a genuine issue of material fact. *See id.* at 764–65.

### A. *First Amendment*

Generally, public employees may not be discharged for exercising their First Amendment rights, including the right to freedom of association. *See Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). However, political affiliation is a valid employment criterion for jobs held by "policymaking" or "confidential" employees. *See Branti v. Finkel*, 445 U.S. 507, 517, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod*, 427 U.S. at 367, 372, 96 S.Ct. 2673. The district court held that Butler's position fell within this policymaker exception to First Amendment protection. *See Butler*, 998 F.Supp. at 342–43. Butler argues that the district

court erred because party affiliation is not an appropriate requirement for the effective performance of her job. We agree with the district court and affirm on this issue.

■ In determining whether an employee is a "policymaker" under *Elrod* and *Branti*, this Court considers several factors:

> whether the employee (1) is exempt from civil service protection, (2) has some technical competence or expertise, (3) controls others, (4) is authorized to speak in the name of policymakers, (5) is perceived as a policymaker by the public, (6) influences government programs, (7) has contact with elected officials, and (8) is responsive to partisan politics and political leaders.

*Vezzetti v. Pellegrini*, 22 F.3d 483, 486 (2d Cir.1994). This list is not exhaustive, but instead serves as a guide; no one factor or group of factors is always dispositive. *See id.; see also Vona v. County of Niagara*, 119 F.3d 201, 209 (2d Cir.1997).

■ Consideration of these factors reveals that the District Court was correct in concluding that Butler held a policymaking position, and was therefore excepted from First Amendment protection against political patronage dismissals. *See Butler*, 998 F.Supp. at 342–43. We analyze the factors with respect to Butler's position at the time she was discharged, *i.e.*, Deputy Bureau Chief. First, all AAGs are exempt employees under New York Civil Service Law §§ 35, 40, 41, N.Y.C.R.R. § 2.1.[2] Second, attorneys have some expertise. *See Vona*, 119 F.3d at 209. Third, as Deputy Bureau Chief Butler supervised approximately 80 other attorneys, so clearly she controlled others within the meaning of the third factor. *See Vezzetti*, 22 F.3d at 486 (plaintiff who managed about sixty employees was policymaker); *cf. Gordon*, 110

F.3d at 890 (although plaintiffs were found exempt from First Amendment protection, third *Vezzetti* factor weighed in plaintiffs' favor because "each [plaintiff] was not in charge of a large group of employees").

We have previously condensed the remaining *Vezzetti* factors to ask "whether the employee in question is empowered to act and speak on behalf of a policymaker, especially an elected official." *Gordon v. County of Rockland*, 110 F.3d 886, 890 (2d Cir.1997); *see also Bavaro v. Pataki*, 130 F.3d 46, 50 (2d Cir.1997). That question can only be answered in the affirmative here because an AAG routinely acts and speaks on behalf of an elected official-the AG. "There is no likely circumstance in which a shared ideology is more important than when an elected official appoints a deputy who may act in his or her stead." *Gordon*, 110 F.3d at 890 (quoting *Regan v. Boogertman*, 984 F.2d 577, 580 (2d Cir. 1993)). Every time Butler managed a case she acted on behalf of the AG, an official elected by the citizens of New York to "effectuate the policies promised the electorate." *Regan*, 984 F.2d at 580.

We are not persuaded by Butler's argument that she was not a policymaker because she had to consult her superiors or clients on policy issues. The issue is not whether Butler independently made policy from day to day, but rather what the general required duties of her position were. *See Regan*, 984 F.2d at 580 ("We do not merely look at her actions taken while in office. Rather, we also look at the power with which she is vested by law, and which is inherent in the office."); *Gordon*, 110 F.3d at 891. Thus, since the AAG job description stated that one of Butler's job responsibilities was "appearing for the Attorney General before State and Federal Courts," Butler satisfied the test outlined in *Gordon*. *See Gordon*, 110 F.3d at 890.

---

**2.** The criteria for exempt status under New York law include the confidential nature of the position, performance of duties that require the exercise of authority or discretion at a high level, or the need for expertise or personal qualities that cannot be measured in a civil service exam. *See Burke v. Axelrod*, 90 A.D.2d 577, 578, 456 N.Y.S.2d 135, 137 (3d Dep't 1982).

The conclusion that Butler was a policy-maker for First Amendment purposes is consistent with other cases in which we have held that attorneys working in public capacities in New York State were not protected against patronage dismissals under the *Elrod-Branti* analysis. *See Adler v. Pataki*, 185 F.3d 35, 46 (2d Cir.1999)(deputy counsel in the New York State Office of Mental Retardation and Developmental Disabilities); *Bavaro v. Pataki*, 130 F.3d 46, 51 (2d Cir.1997)(associate and assistant counsel in the New York State Department of Health); *Gordon*, 110 F.3d at 892 (assistant county attorneys); *Vona*, 119 F.3d at 209 (assistant county attorneys in county department of social services). We have also previously found persuasive "other circuits' cases concluding that government attorneys ... do not fall under the *Elrod-Branti* umbrella. 'All circuit court decisions-and almost all other court decisions-involving attorneys in government service, other than public defenders, have held that *Elrod/Branti* do not protect these positions.' " *Gordon*, 110 F.3d at 890 (quoting Susan Lorde Martin, *A Decade of Branti Decisions*, 39 Am. U.L.Rev. 11, 46–47 (1989)). The district court properly granted summary judgment for the defendants as to Butler's First Amendment claim.[3]

**3.** Because we hold that summary judgment was appropriate as to Butler's First Amendment claim, we do not reach the district court's alternative holding on grounds of qualified immunity. *See Butler*, 998 F.Supp. at 343.

**4.** The Supreme Court's analysis in *Kimel* proceeded as follows. First, the Court held that the ADEA satisfied the test used "[t]o determine whether a federal statute properly subjects States to suits by individuals," because Congress did "mak[e] its intention [to abrogate the States' constitutionally secured immunity from suit in federal court] unmistakably clear in the language of the [ADEA]." *Kimel*, 120 S.Ct. at 640 (quoting *Dellmuth v. Muth*, 491 U.S. 223, 228, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989)).

Second, the Court noted that it had previously found the ADEA valid under Congress's

### B. *ADEA and Title VII*

Butler argues on appeal that the district court erred in holding that she failed to establish a prima facie case of age or sex discrimination. Further, Butler contends that the district court erred in deciding that she was not an employee, as defined in the ADEA and Title VII, and instead fell into the statutory exemption for an "appointee on the policy making level." Because we hold that Butler does not have an ADEA claim after *Kimel v. Florida Bd. of Regents*, —— U.S. ——, 120 S.Ct. 631, 650, 145 L.Ed.2d 522 (2000), and that she was not an employee under Title VII, we do not consider whether she established a prima facie case of either age or sex discrimination.

### 1. *The ADEA*

The ADEA makes it unlawful for an employer to discharge an employee who is at least 40 years old because of her age. *See* 29 U.S.C. §§ 623(a), 631(a); *Gregory*, 501 U.S. at 456, 111 S.Ct. 2395. After Butler's appeal was argued, the United States Supreme Court held that states cannot be sued under the ADEA because Congress lacked the power under Section 5 of the Fourteenth Amendment to abrogate states' Eleventh Amendment immunity for claims of age discrimination. *See Kimel*, 120 S.Ct. at 650.[4] The rule of

Commerce Clause power. However, because *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 72–73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), "held that Congress lacks power under Article I to abrogate the States' sovereign immunity," the *Kimel* Court concluded, "if the ADEA rests solely on Congress' Article I commerce power, the private petitioners in today's cases cannot maintain their suits against their state employers." *Kimel*, 120 S.Ct. at 643.

The Court then stated that "Section 5 of the Fourteenth Amendment ... does grant Congress authority to abrogate the States' sovereign immunity." *Id.* at 644 (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976)). The Court therefore applied the "congruence and proportionality" test to determine that the ADEA was not "appropriate legislation" under Section 5 of the Fourteenth Amendment. *Id.* In order to find

*Kimel* must be applied to all cases still open on direct review. *See Harper v. Virginia Dep't of Taxation,* 509 U.S. 86, 95–97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) ("When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review."); *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 442 (2d Cir.1999). Butler brought her ADEA claim against the NYSDL, an agency of the State of New York. *Kimel* deprives this Court of subject matter jurisdiction over Butler's ADEA claim, so we dismiss the appeal of that issue.

2. *Title VII*

The Supreme Court's holding in *Kimel* does not address Butler's ability to sue the NYSDL under Title VII. *See Kimel,* 120 S.Ct. at 645–46. In dicta, the Court noted that age classifications are "unlike governmental conduct based on race or gender," because age classifications are not suspect under the Equal Protection Clause.[5] *Id.* We therefore turn to the merits of Butler's sex discrimination claim under Title VII.

Title VII makes it unlawful for an employer to discriminate against an employee because of her sex. *See* 42 U.S.C. § 2000e–2(a). Title VII, as amended in 1972, defines an "employee" as

an individual employed by any employer, *except that the term "employee" shall not include* any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or *an appointee on the policy*

*making level* or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision.

42 U.S.C. § 2000e(f) (emphasis added). We hold that Butler was not an "employee" protected by Title VII because she was "an appointee on the policy making level."

■ Our analysis of Butler's status as a policymaker for First Amendment purposes does not control our Title VII inquiry. *See Equal Employment Opportunity Comm'n v. Vermont,* 904 F.2d 794, 797–801 (2d Cir.1990), *overruled on other grounds by Gregory v. Ashcroft,* 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991); *Tranello v. Frey,* 962 F.2d 244, 248–51 (2d Cir.1992). The Seventh Circuit has used a single test to resolve the policymaker question under both the First Amendment and the employment discrimination statutes. *See Americanos v. Carter,* 74 F.3d 138, 143–44 (7th Cir.1996)(reasons for exempting policymakers from First Amendment ban on political patronage dismissals apply with equal force to determination of whether plaintiff bringing suit under Title VII and the ADEA is an appointee on the policymaking level). We disagree with the Seventh Circuit's approach.

■ This Court's First Amendment analysis follows the Supreme Court's decisions in *Elrod* and *Branti.* We consider political patronage dismissals to be an appropriate restraint on First Amendment

legislation appropriate, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* (quoting *City of Boerne v. Flores,* 521 U.S. 507, 520, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)). The Court held that the ADEA failed this test.

**5.** The Court noted that in three cases prior to *Kimel* it had held that the age classifications

at issue did not violate the Equal Protection Clause. *See Kimel,* 120 S.Ct. at 645–46 (citing *Gregory v. Ashcroft,* 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991); *Vance v. Bradley,* 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979); *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (per curiam)).

rights when there is a connection between shared ideology and job performance, *see Regan,* 984 F.2d at 579–80, as determined by applying the *Vezzetti* factors. *See Vezzetti,* 22 F.3d at 486. Our Title VII analysis, by contrast, draws on the language of the statute and congressional intent. *See Vermont,* 904 F.2d at 797–801; *Tranello,* 962 F.2d at 248–51.

*Vermont* and *Tranello* arose under the ADEA, but they control our analysis here. In 1974 Congress amended the ADEA, adopting verbatim the definition of employee found in Title VII. *Compare* 29 U.S.C. § 630(f) *with* 42 U.S.C. § 2000e(f). This Court has examined the legislative history of Title VII to construe the definition of "employee" under the ADEA. *See Vermont,* 904 F.2d at 798; *Tranello,* 962 F.2d at 248–50. We therefore rely on the analysis of the definition of employee from our previous ADEA cases for Butler's Title VII claim.

In *Vermont,* we analyzed the exception for appointees on the policymaking level under the ADEA, and held that Vermont's appointed judges were not policymakers and therefore were not excluded from ADEA protection. *See Vermont,* 904 F.2d at 800. This conclusion was based on our analysis of the definition of employee in the ADEA and Congressional intent with respect to the identical language in Title VII. We considered specifically "whether the policymaker category was meant to comprise only those policymakers working closely with the elected official or whether it was meant to encompass also those operating wholly independently of that official." *Id.* at 798. We concluded that "[t]he contents and structure of the exception suggest that Congress intended the more limited interpretation," and that this conclusion was supported by the legislative history. *Id.*

Title VII's definition of an "employee" was amended in 1972 to add the current exclusions. The House of Representatives Conference Committee specifically added the exemption for appointees on the policy-making level, with the "intent that this exemption shall be construed narrowly." *Id.* at 800 (quoting the Joint Explanatory Statement of Managers at the Conference on H.R. 1746, 92nd Cong., 2d Sess. (1972), *reprinted in* 1972 U.S.C.C.A.N. 2180). *Vermont* relied on the Joint Explanatory Statement of the conferees, which interpreted the adopted definition as exempting "elected officials and members of their personal staffs, and persons appointed by such elected officials as advisors or to policymaking positions at the highest levels of the departments or agencies...." *Id.*; *see also Tranello,* 962 F.2d at 249–50.

In *Vermont,* we concluded that in order to be considered an appointee on the policymaking level an individual must have been appointed by an elected official and must work closely with the appointing authority. *See Vermont,* 904 F.2d at 797, 800; *Tranello,* 962 F.2d at 249. Our narrow construction of policymaker was based on the language of the "employee" definition and on the legislative history:

> We conclude that both the evolution of the exception and the direction that it be construed narrowly support our interpretation that by excluding appointees on the policymaking level, Congress meant to deny ADEA protection only to such appointees as would normally work closely with and be accountable to the official who appointed them.

*Vermont,* 904 F.2d at 800. Because we found that state judges did not work closely with appointing officials, we held that the judges were protected by the ADEA.

*Gregory v. Ashcroft* overruled the holding of *Vermont,* applying different reasoning. *See Gregory,* 501 U.S. at 464–67, 111 S.Ct. 2395. In *Gregory,* the Court held that a state judge who had been appointed by an elected official was an appointee on the policymaking level, and therefore not entitled to ADEA protection from the Missouri constitution's mandatory retirement provision for judges. *See id.* at 455, 111 S.Ct. 2395. The Court's reasoning was

grounded in Federalism concerns: "If Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *See id.* at 460–61, 111 S.Ct. 2395 (quoting *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985)) (internal quotation marks omitted). Finding that the ADEA did not plainly protect appointed state judges, because it was at least ambiguous whether state judges fit the exception for appointees on the policymaking level, the Court concluded that state judges were not protected under the ADEA. *See id.* at 467, 111 S.Ct. 2395.

*Tranello* discussed the remaining significance of *Vermont* after *Gregory. See Tranello,* 962 F.2d at 249–50. In *Tranello,* we concluded that while the specific holding of *Vermont* with respect to appointed state judges was overruled by *Gregory,* its reasoning was still sound. *See id.* First, we pointed out that *Gregory* "cast no shadow on this Court's conclusion that section 630(f) applies only to persons appointed by elected officials." *Id.* at 249. Second, we reaffirmed *Vermont*'s "sound conclusion" that

> both the evolution of the exception and the direction that it be construed narrowly support our interpretation that by excluding appointees on the policymaking level, Congress meant to deny ADEA protection only to such appointees as would normally work closely with and be accountable to the official who appointed them.

*Tranello,* 962 F.2d at 250 (quoting *Vermont,* 904 F.2d at 800) (internal quotation marks omitted). Because the plaintiff in *Tranello* was not appointed by an elected

official and was found on that basis to be outside the ADEA exception, the *Tranello* Court was not required to analyze whether the plaintiff worked closely with the person who appointed him. *See id.* at 249, 251. Nevertheless, *Tranello* reaffirmed *Vermont*'s reasoning, which was based on the language of the statute and congressional intent. Therefore, we apply *Vermont*'s narrow interpretation of the policymaker exception here. *See id.* at 250.

 Butler argues that she is not a policymaker because, although she was appointed by and accountable to the AG, she did not work closely with him. She points to the fact that she was not a member of the AG's executive staff, needed permission to settle a case or take an appeal, did not make policy, and did not work directly with the AG. We disagree with her conclusion.

 It is undisputed that Butler was accountable to the AG. We do not find merit in Butler's argument that she herself did not work closely with the AG, but rather focus on the requirements of the Deputy Bureau Chief position. The resolution of the issue turns on whether it was part of the job of a Deputy Bureau Chief to work closely with the AG. *Vermont* and *Tranello* do not distinguish between working closely in fact and working closely as a general attribute of the job. *See Vermont,* 904 F.2d at 798, 800; *Tranello,* 962 F.2d at 250.[6] We therefore adopt the analysis used in an analogous case, *Whittlesey v. Union Carbide Corp.,* 567 F.Supp. 1320, 1328 (S.D.N.Y.1983), *aff'd,* 742 F.2d 724 (2d Cir.1984), which considered the scope of an exemption in the ADEA permitting compulsory retirement for "bona fide executives" or "high policymaking" employees.[7]

---

6. In *Vermont,* this Court concluded that the policymaker category comprised only policymakers "working closely with the elected official," *Vermont,* 904 F.2d at 798, 800, but also stated that Congress meant to deny ADEA protection to "appointees [who] would *normally* work closely with and be accountable to the official who appointed them." *Id.* at

800 (emphasis added). *Tranello* also framed the requirement both ways. *See Tranello,* 962 F.2d at 250 (quoting *Vermont,* 904 F.2d at 798, 800).

7. 29 U.S.C. § 631(c)(1) reads "Nothing in this chapter shall be construed to prohibit compulsory retirement of any employee who has

*See id.* at 726. In *Whittlesey,* then-District Judge Leval commented that courts should look at the attributes of the position, not the actual performance of the job, to determine whether the employee was a bona fide executive or high policymaker. *See id.* We apply this reasoning here. Adopting the contrary rule would be unduly restrictive of an AG's ability to operate, since it would require him to retain employees like Butler until the moment the AG actually needed to work closely with them or to refrain from development of a position to its full potential.

██ We have already noted that Butler was appointed by an elected official. Butler concedes that as an AAG she could have been called upon to work closely with the AG. Finally, as Deputy Bureau Chief, Butler's supervisory authority placed her at a higher level of responsibility than most other AAGs. These facts lead us to conclude that Butler falls within the policymaker exception to Title VII. Because the policymaker exception should be construed narrowly, *see Tranello,* 962 F.2d at 250; *Vermont,* 904 F.2d at 800, we do not decide whether an AAG who is not a Deputy Bureau Chief is an appointee on the policymaking level. We hold only that Butler, who as Deputy Bureau Chief was in a higher position than other AAGs and could be required to work closely with the AG, was an appointee on the policymaking level under Title VII.

### III. CONCLUSION

As Deputy Bureau Chief, Butler was not protected against a political patronage dismissal because her position fell within the policymaker exception to First Amendment protection. Butler was also not protected under Title VII because her position came within the statutory exception for an appointee on the policymaking level. Butler's ADEA claim fails under *Kimel* because the state's Eleventh Amendment immunity prevents her from suing the

NYSDL for age discrimination. Therefore, we affirm the grant of summary judgment for defendants on Butler's First Amendment and Title VII claims, and we dismiss her ADEA claim for lack of subject matter jurisdiction. Accordingly, the judgment of the district court is Affirmed in part and Dismissed in part.

---

attained 65 years of age and who, for the 2–year period immediately before retirement, is

employed in a bona fide executive or high policymaking position."