**Patricia HALL and Regina James, Plaintiffs,**

v.

**Robert L. LOWERY and Richard B. Adkisson, Defendants.**

**No. LR-C-81-652.**

United States District Court, E. D. Arkansas, W. D.

Aug. 25, 1982.

OPINION

ARNOLD, Circuit Judge, Sitting by Designation.

Patricia Ann Hall and Regina Kaye James, former employees of the Analytical Services Division (also referred to as the Systems Division) of the Arkansas Judicial Department, brought this action against Robert Lynn Lowery, Executive Secretary of the Arkansas Judicial Department, and Richard B. Adkisson, Chief Justice of the Supreme Court of Arkansas. The complaint states claims under Title VII of the Civil Rights Act of 1964, as amended to include employees of state governments in 1972, 42 U.S.C. § 2000e et seq., the Equal Pay Act, 29 U.S.C. § 206(d)(1), and 42 U.S.C. § 1983. The case was tried to the Court,[1] neither side having demanded trial by jury, on May 10, 11, 12, and 13, 1982. At the request of the parties, the Court agreed to receive and consider post-trial briefs, the last of which was filed on June 21, 1982. The case is now ready for decision. The principal question presented is whether the defendant Lowery's decision to discharge the plaintiffs from their positions as Data Auditors II was motivated in whole or in part either by their sex or by their lack of political association with the defendant Adkisson. The Court finds that plaintiffs have not borne their burden of proof on either of these theories, and therefore the complaint will be dismissed with prejudice. This opinion constitutes the Court's findings of fact and conclusions of law.

I.

The factual background may be briefly stated. The defendant Adkisson was elected Chief Justice of the Supreme Court of Arkansas in the general election in November of 1980. He took office on January 1, 1981. Among his other duties, "[t]he Chief Justice of the Supreme Court of Arkansas shall be the administrative director of the Judicial Department of the State and shall be responsible for the efficient operation

Melva Harmon, Lavey & Harmon, Little Rock, Ark., for plaintiffs.

Nelwyn Davis, Asst. Atty. Gen., Robert F. Fussell, Little Rock, Ark., for defendants.

1. All of the United States District Judges in regular active service in the Eastern and Western Districts of Arkansas having recused themselves, the undersigned was designated by the Chief Judge of the United States Court of Appeals for the Eighth Circuit to try this case.

thereof and of its constituent courts and for the expeditious dispatch of litigation therein and of the proper conduct of the business of said courts." Ark.Stats. § 22–142. The Judicial Department is headed, for administrative purposes, by an Executive Secretary "who shall be appointed by the Chief Justice of the Supreme Court with the approval of the Judicial Council and shall hold office at the pleasure of the Chief Justice." Ark.Stats. § 22–143. On January 1, 1981, the defendant Lowery became Executive Secretary of the Judicial Department, having been appointed by the Chief Justice as provided by law. Among the duties of the Executive Secretary are the preparation of statistical data and reports of the business of the courts, examination of the statistical systems of the courts, making recommendations to the Chief Justice for a uniform system of judicial statistics, and the collection and analysis of statistical and other data concerning the business of the courts. Ark.Stats. § 22–143(b), (d), (e). The statute further provides that "[t]he executive secretary shall, with the approval of the Chief Justice, appoint clerical assistants as may be necessary . . . ." In addition, the regular session of the Arkansas General Assembly, held between January and April of 1981, specifically directed the Chief Justice, "with the assistance of the Executive Secretary of the Department, [to] devise a uniform system of numbering, cataloging, and classifying cases in all the courts of record in this State . . . ." Act 489 of 1981, § 1, now codified as part of Ark.Stats. § 22–142. During the same session, the Legislature also enacted Act 265 of 1981, creating a Judicial Reapportionment Board, and directing that the Board report to the General Assembly, using the new uniform system of case accounting to be created pursuant to Act 489, on how to create four additional judgeships and divide the caseload equitably throughout the State. The Board, of which the Chief Justice was a member, was directed to "draft legislation reapportioning the existing judicial districts of this State and furnish such legislation to the Arkansas General Assembly at its next . . . Session." The Board was to go out of existence on January 1, 1982.

As noted, Lowery became Executive Secretary of the Judicial Department on January 1, 1981. Act 265, creating the new temporary State Board of Judicial Reapportionment, became law on February 27, 1981, and Act 489, directing the Chief Justice to devise a uniform system of case accounting, became law on March 16, 1981. Much of Lowery's time during the initial months of his tenure was taken up with legislative relations and, when the two new acts affecting his department became law, complying with these statutory directions. The Analytical Services Division was responsible for collecting and analyzing statistics from each of the courts of record within the State, so obviously it was an important focus of Lowery's attention.

The plaintiffs were at that time employees of the Systems Division, with jobs described as Data Auditor I (DA I). Immediately after Lowery took office, two employees of the Systems Division, including Angela Jegley, the director, resigned. Lowery promoted the two plaintiffs from DA I to DA II and also hired two new employees: Steve Spikes and Jack Butler. Spikes and Butler had been active in Chief Justice Adkisson's campaign the previous year. Lowery first offered the job of Chief of the Systems Division to a woman lawyer, but she turned it down because of the low salary, and John Stewart, who had been functioning as Acting Director, was then made Director. Butler was hired as a DA I, a position he retained until January, 1982, when he was promoted to DA II. Spikes, on the other hand, after a short initial stint as a DA I, was placed in a higher-paying slot until July 1, 1981, at which time he was formally redesignated as a DA I, with a reduced salary.

For reasons that will be addressed in more detail later in this opinion, the relationship among the plaintiffs, on the one hand, and Spikes, Butler, and Lowery, on the other, began to deteriorate after three or four months. By the end of the fiscal year, June 30, 1981, Lowery had become sufficiently hostile to the plaintiffs to deny

them a cost-of-living increase customarily awarded with the beginning of each fiscal year, an increase actually given on July 1, 1981, to every other employee of the Judicial Department. At some point later in July, plaintiffs filed charges with the Equal Employment Opportunity Commission (EEOC) against the Department. After the charges were filed, Lowery carried out what he testified was an earlier formed decision to discharge the plaintiffs, and they were terminated by letters dated August 14, 1981. Steve Spikes, together with Jack Butler, was promoted to a DA II on January 1, 1982. (The DA II position pays more than DA I, but the duties are not materially different.)

## II.

The Equal Pay Act claim may be disposed of without extended discussion. It is not mentioned in plaintiffs' post-trial brief, but it may not have been formally abandoned. The theory of the claim is apparently that plaintiffs were paid less than Spikes, a man, between February 1, 1981, and July 1, 1981. Spikes was initially hired, on January 14, 1981, as a DA I, at a salary of $580 semi-monthly. (All salary figures will be given on a semi-monthly basis throughout this opinion, because defendants' records are kept in those terms.) But on February 1, 1981, Spikes was transferred into a slot denoted "Accounting Chief of Systems," at a salary of $744.80. This slot was actually created for the Chief of the Systems Division, but at the time there was only an Acting Chief, John Stewart, who was being paid a salary of $744.80, the same as the salary designated for the chief of the division, but under the title of "Court Planner." (The use of slots for employees who are performing somewhat different functions from those indicated by the title of the position is not uncommon in state government, at least in Arkansas.) Spikes remained in the "Accounting Chief of Systems" slot until July 1, 1981, when he was again made a DA I, and his salary was reduced to $638. Later, as already noted, he became a DA II, effective January 1, 1982, at a salary of $673.75. Stewart, in the meantime, was formally named Chief and assumed that slot on July 1, 1981, at a salary of $819.33. The claimed discrimination arises from the fact that plaintiffs, as DA II's after January 16, 1981, were being paid only $632.50, considerably less than Spikes. (The Equal Pay Act claims concerns only a disparity between plaintiffs and Spikes—Butler was being paid $52.50 less than plaintiffs between January 16, 1981, and July 1, 1981, when he was raised to $638.)

■ The Equal Pay Act provides, in pertinent part:

(d)(1) No employer ... shall discriminate ... between employees on the basis of sex by paying wages to employees ... at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions ....

29 U.S.C. § 206(d)(1). The claim must fail simply because Spikes and plaintiffs were not performing "jobs the performance of which require[d] equal skill, effort, and responsibility" during the period in question. On February 1, 1981, when Spikes was put in the higher-paying slot, the legislative session had already begun, and judicial reapportionment was an issue under active discussion. Lowery assigned Spikes to work with him on this question. He also directed Spikes to become familiar with all of the activities of the Systems Division, telling him that he might at some point be made director of the division. (As a matter of fact, Spikes was never promoted to director, but he did function as acting director for a time in July.) These responsibilities and functions were quite different from those of DA II's, which were largely concerned with the collection and analysis of statistics. Dealing with the legislature, and becoming familiar with all of the work of the division, required skills of a different order from those of DA's, and Lowery believed in good faith that Spikes possessed

those skills. Plaintiffs were no more discriminated against by the higher rate of pay received by Spikes, than was Jack Butler, a man hired at approximately the same time as Spikes. The Court finds that there was no discrimination on the basis of sex in the differential between the salaries of plaintiffs and Steve Spikes.

### III.

I now turn to the allegation that plaintiffs were discharged at least in part because of their sex, in violation of Title VII. A threshold legal contention will be addressed first.

### A.

█ Defendants initially claimed that Title VII does not apply to the employment decisions questioned in this case because plaintiffs are not "employees" as defined in the statute, 42 U.S.C. § 2000e(f).[2] The contention is clearly without merit. Although the Chief Justice is, of course, elected to public office by the qualified voters of the State, and although the defendant Lowery was chosen by the Chief Justice to be on his personal staff, and also can be described as an appointee on the policymaking level and an immediate adviser with respect to the exercise of the constitutional powers of the office, the same is manifestly not true of plaintiffs. They were not elected by anyone, they were not on the Chief Justice's personal staff, and did not make policy, and they were not immediate advisers with respect to the exercise of the constitutional powers of the Chief Justice. The personal-staff exception should be narrowly construed, but even if it were broadly interpreted, it could not cover this case.[3]

### B.

█ This is a disparate-treatment case. The question, therefore, is whether defendants intentionally discriminated against plaintiffs, either by paying them a lesser salary, or by discharging them, on account of their being women. What has already been said about the Equal Pay Act suffices to dispose of this claim, so far as salary level is concerned. It remains to discuss plaintiffs' discharge.

█ The testimony in this case is in irreconcilable conflict, perhaps even more so than in the typical lawsuit. Plaintiffs have made a prima facie case: they are part of the class that Congress sought to protect, they were qualified to perform their jobs, they were discharged, and the jobs thereafter remained open to applicants of similar qualifications. The defendant Lowery seeks to justify the decision to discharge plaintiffs on the basis of various incidents of what he believed to be insubordination, violation of departmental policy, lack of cooperation with other employees, and a contumacious attitude towards himself.[4] These reasons, if in fact they existed as motivations on the part of Lowery, would be legitimate and nondiscriminatory justifications for the personnel action that he took. The real question is whether these reasons were mere pretext, excuses offered after the fact for the real reason, plaintiffs' sex. In approaching this question the Court is mindful that direct evidence of intentional discrimination seldom exists. The trier of fact, instead, is obligated to be alert to subtle signs of discriminatory intent, to "read between the lines," *Danzl v. North St. Paul-Oakdale-Maplewood School District*, 25 F.E.P. Cases 296, 300 (8th Cir.),

---

2. This subsection provides, in pertinent part, "that the term 'employee' shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policymaking level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office."

3. Defendants also claimed, at an early stage of the dispute, before the complaints were filed, that the Judicial Department does not employ enough people to be subject to Title VII, but this contention has been abandoned.

4. Most of these reasons are subjective. The Court must therefore scrutinize them particularly closely, e.g., *Coble v. Hot Springs School Dist. No. 6*, 682 F.2d 721 (8th Cir. 1982), and I believe I have done so.

*vacated on rehearing en banc on other grounds*, 663 F.2d 65 (8th Cir. 1981) (per curiam). The Court is also mindful that the burden of proof remains on the plaintiffs, after all the evidence is in, to persuade the trier of fact that the impermissible factor, in this case sex, played some part in the adverse employment decision. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

The Court found defendant Lowery a credible witness and believes his testimony as to why he first declined to give plaintiffs a raise that every other employee received, and as to why he then discharged plaintiffs. There was, to put it mildly, a conflict between Lowery and plaintiffs. Probably neither side was sufficiently patient with the other, but the fact remains, for whatever reason, that they did not get along. Lowery began hearing, for example, that plaintiffs were not trying hard enough to help Spikes and Butler learn their new jobs. Lowery believed these reports, which came principally from Spikes and Butler themselves, and perhaps he would have been better advised to confront the plaintiffs early in order to clear the air, but the fact that he did not do so, in my view, was not at all related to their being women. He simply had more confidence in Spikes and Butler because he had hired them. All of the other people at the Division had been employees under Lowery's predecessor, Jim Petty, who had been cool to Lowery at the time of transition. The testimony of Teresa Baldridge, a disinterested witness who left her employment at the Division in June of 1981, is important on this score. According to Ms. Baldridge, the plaintiffs were resentful of Butler and Spikes, and the resentment probably began with the plaintiffs, instead of the other way around. Part of the resentment is understandable,

because Spikes was being paid more than plaintiffs, and plaintiffs found out about it, but that does not justify the attitudes towards Lowery that plaintiffs later expressed. In particular, both plaintiffs used obscene language in referring to Lowery personally, and made no effort to conceal their hostility towards him from the other employees in the Division. As Denise Selby, a witness called by plaintiffs, described it, the conversational atmosphere in the work place had become "cruel," and plaintiffs were disgruntled at Lowery. These bad feelings became common knowledge among the employees, and Lowery learned of them from Butler and Spikes. Both plaintiffs denied making any vulgar remarks about Lowery, but the Court finds that the remarks were made. Further, according to the testimony of Eileen Parins, who came to work on June 16, 1981, the plaintiff James said she hated Lowery. Again, this remark was denied, but the Court finds that the remark was in fact made.

There were other problems that exacerbated the situation. Lowery felt, for example, that plaintiffs were insubordinate in their use of "compensatory time." When Lowery took office, he found what he believed to be a chaotic situation with respect to this practice on the part of employees. Employees were apparently freely working extra time whenever they wished, and then claiming compensatory time off in return. A policy memorandum, which is in evidence as plaintiffs' exhibit (PX) 10, contains Lowery's response to this practice.[5] This policy directive quite clearly excluded any compensatory time except for work performed away from home on Saturdays, Sundays, or official holidays. It also provided that no compensatory time could be taken at all unless a request were made in advance, and

---

5. The memorandum provided, in pertinent part:

    COMPENSATORY TIME

    Staff members working or performing official duties, away from their residence, on a Saturday, Sunday or official holiday, at the request or direction of the Executive Secretary will be allowed compensatory time during a regular work week. In order to allevi-

ate the necessity for record keeping, compensatory time must be taken within 30 calendar days from the date it accrues. Requests for compensatory time are to be made in advance and receive the approval of the Executive Secretary. Compensatory time like annual leave and sick leave, will be measured in 1/2 days.

the approval of the Executive Secretary obtained. Documentary evidence shows that plaintiffs did not abide by this policy. Perhaps they did not understand it, and perhaps the Chief of the Systems Division did not enforce it properly, but the fact remains that their practices were at odds with the policy as laid down by Lowery. Plaintiffs' practice was simply to notify Lowery after compensatory time had been taken, and then to assume, from the absence of a response from him, that approval had been obtained. See, *e.g.*, PX 51. Perhaps Lowery should have responded at once and openly objected, instead of allowing himself to grow resentful and irritated in silence, but that is not a judgment that the Court can make. The fact is that plaintiffs did not follow the written policy on compensatory time, although this was a personnel matter to which Lowery attached some importance.

In addition, Lowery believed that plaintiffs were claiming too much money for travel expenses. On May 4 through 8, for example, plaintiffs made a trip to Fayetteville, Arkansas, on official business. For each of the days May 4 through 7, Monday through Thursday, their travel-reimbursement forms (known as TR–1) showed $19.00 for lodging and $16.00 for meals, or a total of $35.00 per day, which was the maximum per diem allowable without special permission from Lowery. For Friday, May 8, the last day of the trip, on which no lodging could be claimed because plaintiffs were returning to Little Rock, plaintiff Hall showed $25.00 for meals, and plaintiff James showed $35.00 for meals. See PX 18, 19. Lowery, who had begun reviewing all of the TR–1 forms personally, became incensed at these claims, which he considered clearly inflated, and marked both the forms void. Plaintiffs were allowed only $16.00 for meals on Friday, May 8, apparently on the theory that they ate no more on Friday than on any other day that week. The Court finds Lowery's reaction completely understandable. In view of the fact that it had cost plaintiffs only $16.00 to eat on the first four days of the week, it is hardly surprising that a meal charge of $25.00 and

$35.00, respectively, on the last day, seemed excessive. Plaintiffs could, under travel regulations, have supplied further information to justify their claims, but they did not do so. Plaintiffs claim that there was an unwritten policy within the division allowing excess expenses from previous days to be recouped on the last day of a trip, under the heading of "meals," and the testimony of John Stewart, Chief of the Systems Division, corroborates this claim, but Lowery testified that he knew of no such policy, and the Court believes his testimony. Plaintiffs also object that in December of 1981 Lowery allowed travel expenses that apparently were similarly excessive on the part of Spikes and Butler, and the documents in evidence support this claim. Lowery did not offer a completely satisfactory explanation for this apparent discrepancy, but the discrepancy is probably due more to administrative laxity than to any other factor. Although this kind of differential treatment can in some cases be evidence of discrimination, in the present situation it is not substantial enough to justify such an inference.

There is conflicting testimony about a number of other subjects on which the plaintiffs and Lowery disagreed, but no useful purpose would be served by pursuing all of them in detail. Matters began to come to a head in late May, by which time Lowery had decided that plaintiffs would have to go. Both Butler and Spikes were aware by some point during the month of June that Lowery had made this decision. Lowery's purpose in delaying the actual discharge of plaintiffs was to get them to write down all of their special knowledge about the collection and use of data in the Systems Division. The caseload statistics were stored in computers, and specialized knowledge of the computers' operation and programming was necessary in order for the Division to function properly. Lowery believed that a good deal of the essential information was in plaintiffs' heads, not written down anywhere in any form that would be usable by the other employees. Several of the people employed at the Divi-

sion had resigned since Lowery had become Executive Secretary, and, although at least one employee, Pete Neathery, was familiar with the computers to some degree, the plaintiffs Hall and James were apparently more knowledgeable than anyone else. Lowery did not want to let them go until he was satisfied that the Division could function properly without them. He therefore directed a series of memoranda to the Division, instructing plaintiffs and others to prepare written manuals describing every operation essential to the functioning of the office. On July 21, 1981, Lowery finally got the information he wanted in a form he considered satisfactory. He was still not ready to fire plaintiffs, however, because he wanted to be sure that Steve Spikes could actually use the information and follow the procedures that had been supplied in written form.

On August 9, 1981, a Sunday, Spikes, at Lowery's request, picked Lowery up at the airport on his return from a trip on official business. At that time Spikes told Lowery that he had mastered the information and procedures contained in the written memorandum that had been compiled, and Lowery told Spikes that plaintiffs were then in their last pay period, that is, that he was going to fire them at once. This testimony is corroborated by Spikes, and the Court believes it. At the end of the next work week, on August 14, 1981, a Friday, Lowery wrote the letters of termination to plaintiffs.

This sequence of events could in some circumstances create a well-founded claim of retaliation, a theory that plaintiffs also press, because plaintiffs had filed their EEOC charges against Lowery and the Department quite recently. In most situations, a discharge following hard on the heels of the filing of an EEOC charge creates a strong inference of retaliation. See, e.g., *Womack v. Munson*, 619 F.2d 1292 (8th Cir. 1980), *cert. denied*, 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981). In· this case, however, Lowery testified that he did not know that charges had been filed until Tuesday, August 11, 1981. The decision to discharge plaintiffs, therefore, which had become final on Sunday, August 9, 1981, could not have been triggered by the filing of the charges. Obviously the claim that Lowery did not know of the charges until August 11 must be treated with care, since it rests only on Lowery's testimony, and this kind of disavowal, in some circumstances, could be regarded with suspicion. In this case, however, the Court finds, based upon all the evidence in the case as well as observation of the witnesses, that Lowery was telling the truth. It follows, for the reasons stated, that plaintiffs' Title VII claim must fail. Their treatment was not due in any part either to their sex or to the fact that they had complained to the EEOC.

### IV.

Plaintiffs also claim, see, *e.g.*, *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), that their discharge violated the First Amendment, as made applicable to the states by the Fourteenth Amendment. The theory is that Spikes and Butler were treated better than plaintiffs, and plaintiffs were fired, because Spikes and Butler had been political supporters of the defendant Adkisson, while plaintiffs had not.

The Court assumes that this theory is legally tenable, and certainly it is a logical implication of *Elrod v. Burns, supra.* I have already described, however, the reasons that I believe in fact motivated Lowery's personnel decisions, and plaintiffs' lack of political affiliation with the Chief Justice was not one of these reasons. Probably Spikes and Butler, as plaintiffs claim, did get their jobs at least in part because they had worked in the defendant Adkisson's campaign. That would not be surprising, and indeed plaintiffs do not claim that such a decision, in and of itself, is improper. In order to succeed on their present theory, plaintiffs' proof must go at least one step further: they must show not only that Spikes and Butler were employed for political reasons, but also that they, the plaintiffs, were discharged for political reasons. The proof simply falls far short of any such

showing. Among other things, Lowery promoted plaintiffs to the position of DA II; he promoted John Stewart to Chief of the Systems Division; and he hired a number of other new employees, all without reference to any political activity or lack of it. Lowery did consult with the Chief Justice before hiring Spikes and Butler, as will be noted below, but there is no evidence that he consulted with the defendant Adkisson before discharging plaintiffs. The claim of political discrimination is without merit.

## V.

The reader will have noted that most of the discussion about personnel actions and their motivation has been directed to the defendant Lowery. Little has been said of the activities of the defendant Adkisson. The reason is that Chief Justice Adkisson had little, if anything, to do, in a personal sense, with any of the events of this case. Although he is ultimately responsible for the activities of the Judicial Department, he did not in fact give any instructions to Lowery, so far as the record shows, with respect to any personnel decision. When consulted about hiring Spikes and Butler, he said, in effect: "They are both good people, but be sure they can do the job." He did not direct Lowery to fire plaintiffs, or even know of Lowery's decision to do so until it had already been carried out. There is simply no substantial evidence upon which the defendant Adkisson can be held liable on any of plaintiffs' theories.

## VI.

It follows that the complaint must be dismissed with prejudice, and judgment is being entered accordingly. Defendants' request that plaintiffs be required to pay their attorneys' fees is denied. The action is not so completely without merit as to justify such extraordinary relief.