# EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff, Appellant,

v.

# COMMONWEALTH OF MASSACHUSETTS, et al., Defendants, Appellees.

## No. 88–1419.

United States Court of Appeals, First Circuit.

Heard July 28, 1988.

Decided Oct. 7, 1988.

---

Beatrice Valdez with whom Charles A. Shanor, Gen. Counsel, Gwendolyn Young Reams, Associate Gen. Counsel, and Lorraine C. Davis, Asst. Gen. Counsel, Washington, D.C., were on brief for plaintiff, appellant.

H. Reed Witherby, Asst. Atty. Gen., with whom James M. Shannon, Atty. Gen., William L. Pardee and Rosanna Cavallaro, Asst. Attys. Gen., Boston, Mass., were on brief, for defendants, appellees.

Before BOWNES, TORRUELLA and SELYA, Circuit Judges.

TORRUELLA, Circuit Judge.

This appeal concerns a very circumscribed question, although one of undeniable importance. It requires us to decide whether Congress intended to significantly limit the power of the people of the Commonwealth of Massachusetts to determine its qualifications of judges. The controversy arises out of certain amendments to the Age Discrimination in Employment Act of 1967 (ADEA or Act). These amendments brought that Act into apparent conflict with a provision of the Massachusetts Constitution mandating retirement at age 70 for all state judges. We find no sign, however, of a sufficiently clear statement by Congress that it intended to overrule the clear intent of the people of a state in an area intimately and fundamentally related to that state's self-governance. In consequence, we hold that the ADEA was not intended to apply to appointed state judges, and affirm the district court's judgment.

In 1972 the electorate of the Commonwealth of Massachusetts voted to amend the judicial tenure provision of the Massachusetts Constitution. Part II, Chapter 3, Art. 1 was amended to make the age of 70 the mandatory retirement age for all state judges. At that time the ADEA prohibited discrimination on the basis of age against employees less than 65 years of age, excluding state and municipal employees. In 1974 Congress added states and any other political subdivisions to the definition of employer under the Act. In 1978 the maximum age limit was changed from 65 to 70; and, finally, effective January 1, 1987, Congress made the ADEA applicable to all employees by eliminating the age limit altogether. Thus, a series of amendments to the ADEA brought that Act into facial conflict with the state constitutional provision mandating retirement at age 70.[1] If we find that a conflict in fact exists, of course, the Supremacy Clause of the United States Constitution requires that a federal statute take precedence over even a state *constitutional* provision. *See*, Art. VI, cl. 2, United States Constitution.

The ADEA definition of a covered employee is not, however, all encompassing. Congress defined "employee" very broadly but set forth several exceptions to that definition:

> The term "employee" means an individual employed by any employer except that

---

**1.** There is no dispute among the parties that a mandatory retirement age is a prima facie violation of ADEA.

the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policymaking level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency, or political subdivision. 29 U.S.C. § 630(f).

The question we must resolve today is whether appointed state judges (as they all are in Massachusetts) remain within the broad category of "employee" or whether they are withdrawn from that group by one of the enumerated exceptions. Indeed, in light of the significant intrusion into properly state-dominated affairs that such a finding would entail, we will look to see if Congress clearly and unequivocally manifested an intent to regulate the requirements a state can impose on those who hold office in the state's judiciary. *See United States v. Bass*, 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971) ("In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision"). *Cf. De Bartolo v. Florida Gulf Coast Building and Construction Trades Council*, — U.S. —, —, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988) ("where an otherwise acceptable construction of a statute would present serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.").

Without question, the tenure of state judges is a question of exceeding importance to each state, and a question tradi-

tionally left to be answered by each state. Any federal encroachment on a state's freedom of choice in this area, therefore, strikes very close to the heart of state sovereignty.[2] Congress is not likely to take such step lightly, nor are we inclined to imply such congressional intent where we find Congress did not consciously address the question.

Since Congress and the reluctance of Congressmen to interfere with state rights, are the principal checks on federal interference in state affairs, it seems to us important that we not presume a severe limitation on powers traditionally reserved to the states in the absence of a clear congressional mandate to that effect. One commentator explains why this should be: "[To] give the state-displacing weight of federal law to mere congressional *ambiguity* would evade the very procedure for lawmaking on which [the Court] relie[s] to protect states' interests." L. Tribe, *American Constitutional Law*, § 6–26, at 480 (2d ed., 1988).

With these considerations in mind, we return to the statute itself. Unlike most states, Massachusetts has chosen an appointed, rather than elected, judiciary. Unlike most states, therefore, Massachusetts' judges do not fall under the first exception in the statute ("any person elected to public office"). Neither do its judges meet the second exception: "any person chosen by such [elected] officer to be on such officer's personal staff." And the fourth one is inapposite as well: "an immediate adviser with respect to the exercise of the constitutional or legal powers of the office."

If appointed judges fit under any exception it is the third one: "an appointee on the policymaking level." Certainly the judges under consideration are appointees. Just as surely they can be said to be "on the policymaking level." While judges have at times been thought to act as somewhat mechanized law-and-fact processors, scientifically applying settled principles of

---

**2.** It is also without question, of course, that a state could not impose requirements which violated federal anti-discrimination statutes or constitutional provisions. The Supremacy Clause ensures that even appointments of state judges cannot be the result of illegal or unconstitutional discrimination.

law to established fact patterns, that image hardly meshes with the reality of judging. The trial judge in this case, in fact, provides us with an apt description of the kind of decisions that members of the bench are called upon to make:

> It is nevertheless clear that "policymaking" is indisputably a part of the function of judging to the extent that judging involves lawmaking to fill the interstices of authority found in constitutions, statutes, and precedents (a function more predominant in appellate judging than in the performance of trial judges, who are of course, the group whose interests plaintiff EEOC seeks to protect in this litigation). Moreover, the substantive interest identified by the phrase "on the policymaking level" is closely aligned with an interest referred to by phrases such as "exercise of discretion" and "exercise of judgment," which are indisputably descriptive of most of the performance of those persons within the judicial branch who serve as judges (including trial judges).

*E.E.O.C. v. Commonwealth of Massachusetts*, 680 F.Supp. 455, 462 (D.Mass.1988).

This judicial type of policymaking is unlike that done in the executive and legislative branches of government. It nevertheless requires the same kind of decisionmaking, and the same kind of forward thinking that is required of "appointees on the policymaking level" in those other two branches of government. And it certainly concerns state government to a similar degree.

The Commission argues, however, that this is not Congress' intended meaning of "appointee on [a] policymaking level." It relies principally on the absence of any mention of appointed state judges in the relevant legislative history. As we pointed out earlier, however, if Congress did not specifically consider applying ADEA to judges, and the exception by its terms and its goals, appears to apply to judges, we will so construe it. The absence of any mention of judges in legislative debate, therefore, does not help the appellant's case.

The exceptions for state government officials occur in both Title VII and the ADEA. There was very little debate in Congress concerning this provision of the ADEA. However, this issue, including the scope of its coverage, generated controversy during the debate on Title VII. Therefore, most of the legislative history on which appellants rely concerns the amendments to Title VII. Most of the debate was initiated by Senator Ervin, who was concerned that the original definition of employee in Title VII—which is identical, including the same exceptions to the ADEA definition—would reach also to those "persons who exercise the legislative, executive, and judicial powers of the States and political subdivisions of the States." 118 Cong. Rec. 1837 (1972). The debate is relevant, therefore, to the scope of the "employee" definition in ADEA. If anything, however, it supports the appellees' position. Throughout, the legislators were attempting to address Senator Ervin's concern that "top decisionmakers" in all three branches should not be covered by the bill. There is no intimation that they saw a relevant difference between decisionmakers in the different branches of government.

The Commission also argues that to fit within the third exception to the definition, the appointees must be "an elected official's first line advisers." This argument rests in part on the Commission's apparently unintentional misreading of the conference managers' report. The report actually reads:

> It is the intention of the conferees to exempt elected officials and members of their personal staffs, and persons appointed by such elected officials as advisers *or* to policymaking positions at the highest levels of the departments or agencies of State or local governments, such as cabinet officers, and persons with comparable responsibilities at the local level. It is the conferees' intent that this exemption shall be construed narrowly.

Joint Explanatory Statement of Managers at the Conference on H.R. 1746, 92d Cong., 1st Sess., *reprinted in part in* 1972 U.S.

Code Cong. & Admin. News 2137, 2179, 2180 (1972). The underlined "or," originally omitted by the appellant, makes it clear that Congress intended two categories: policymakers, who need not be advisers; and advisers, who need not be policymakers.

After Senator Cranston's initial remark regarding Title VII's coverage of the top officials in all three branches, most of the debate was carried on using members of the executive branch for illustration. The Commission urges us to view this debate as requiring a close working relationship between appointer and appointee, not only for an "adviser," but also for a "policymaker." It may be true that many, though surely not all, of the "policymaking positions at the highest levels of the departments or agencies of State or local governments" in the executive and even legislative branches require a close relationship between appointer and appointee. And yet that does not mean that the same is true of the judiciary.

The difference, of course, is that appointed policymakers in the highest positions of the legislative and executive branches of government generally do work very closely with those officials who have appointed them, and in many instances leave the final decisionmaking to the appointer. But judges operate under a completely different set of assumptions. Each judge, once appointed, and no matter how lowly, is expected to act independently from his or her appointer. This difference does not act to preclude application of the "policymaker" exception to the judiciary, it simply calls for a slightly different understanding of who is a policymaker for purposes of the exception.[3] It is also worth noting that Congress did not strictly limit the exception to policymakers, but rather applied it to all those "at a policymaking level." This appears to be a somewhat more flexible standard, which requires us to look at the position of the appointees within government

structure, and not so much at the particular duties of the persons involved.

In addition, the narrow construction mentioned by the conferees, on which the appellant's brief relies so heavily, is clearly intended to limit the reach of the exception down the chain of command, and not so much across agencies or departments. This is evident from the very language of the conferees, who placed no restrictions on the number of agencies or departments covered, but limited the positions covered to those at the highest levels. Clearly, each judge, as a separate and independent judicial officer, is at the very top of his particular "policymaking" chain of command, responding, if we can call it that, only to a higher appellate court.

The Commission also relies on certain federal appellate court decisions addressing employees of the other branches of government, mainly *Anderson v. City of Albuquerque,* 690 F.2d 796 (10th Cir.1982). In that case the court refused to except the Human Rights Board Director from protection under the Act because she did not "formulate policy *or* advise the mayor so as to create the immediate and personal relationship required by the exemption." *Id.* at 801 (emphasis ours). The case is simply inapposite. The Circuit Court found that the employee in question was not "in fact, appointed by an elected official within the meaning of" the exception. *Id.* at 801. Its observations regarding the required close relationship have to do with another exception—as "immediate adviser"—and not with the appointed policymaker exclusion. Neither *Anderson,* therefore, nor the other cases cited by appellant, nor the legislative history persuade us that Congress intended not to include judges when it referred to "appointees at the policymaking level," or "in policymaking positions."

The reading we adopt today is clearly the one compelled by the logic of the statute. As the district court noted, the statute strikes a delicate balance between the pro-

---

**3.** The cases cited by the Commission are similarly distinguishable, since none of them concern appointed judges. *See Curl v. Reavis,* 740 F.2d 1323, 1328 (10th Cir.1984) (deputy sheriff not under sheriff's "personal direction" and no

"highly intimate and sensitive" relationship with him); *Hall v. Lowery,* 545 F.Supp. 1152 (D.C. Ark.1982) (employees of judiciary not "personal staff" because not close enough to elected chief justice).

tection of employees from age discrimination, and the protection of a state's—and its people's—ability to independently govern itself. As the legislative history makes clear, that second concern sparked the genesis of the exceptions to the "employee" definition. The distinction between elected and appointed state judges, which the appellant would have us draw, is nonsensical in terms of furthering the balancing intended by Congress. As far as their functions within the state government are concerned, the two kinds of judges are identical. However, the Commission justifies its proposed distinction between elected and appointed judges by saying that Congress enacted the distinction in order not to restrict the state voters' choices in any way. We agree that this was Congress' intent, at least in part, when it approved the exceptions. But the Commission's reading of those exceptions does not further that intent. The voters of Massachusetts overwhelmingly chose to set the age of 70 as the maximum age for their judges, and felt so strongly about it that they embodied the requirement in their constitution. This expression of choice is at least on a par with the election of a particular judge.[4]

In addition, we also must remember that the abolition of the mandatory retirement age would have significant negative consequences for the Massachusetts judiciary. The Commonwealth has expressed, by means of that mandatory retirement provision, a strong interest in not permitting judges to stay in their position well into an advanced age. The underlying concerns prompting the choice to conserve a relatively young judiciary were well expressed by the Massachusetts Supreme Judicial Court (SJC):

> A line drawn at age seventy eliminates the anguish, time, delay, expense, and embarrassment of the supervision and removal of older judges of failing competence pursuant to an evaluation process. An age limit on the service of judges also tends to assure that important decisions affecting citizens and the future of the Commonwealth will be made by judges who command respect because they share experiences and understandings similar to those of the majority of adult citizens of the Commonwealth. Generational differences in points of view are not fanciful. Moreover, at this time and certainly for the near future, a mandate that judges retire at seventy makes it possible to increase the proportion of minority group members and women in the judiciary, thereby making the judiciary more representative of society.

*Apkin v. Treasurer and Receiver General,* 401 Mass. 427, 435–36, 517 N.E.2d 141, 146 (1988).

The Commission opposes this reasoning, arguing that the ADEA embodies the congressional conclusion that age per se is not a good predictor of capacity. This may well be true, but it does not defeat Massachusetts' interest in the age limit: In the first place, as the SJC pointed out, Massachusetts does not wish to take up the perilous task of evaluating the performance of its older judges, and impeaching or addressing (another method of removing from office) those the legislature feels are no longer qualified. The task is as undesirable as it is difficult, not only because it entails close legislative and executive scrutiny of judicial performance, with a consequent loss of judicial independence, but also because the only constitutionally available methods for removing judges are extraordinary ones, not suited to the kind of pedestrian "discharge for cause" which the Commission argues is still open to the Com-

---

4. In *Schlitz v. Virginia,* 681 F.Supp. 330 (E.D.Va. 1988), *rev'd on other grounds,* 854 F.2d 43 (4th Cir.1988), the court reached the opposite result. We are not convinced by its logic. The court's reasoning that elected judges were excluded from ADEA protection not because of concerns for state autonomy but out of faith in a non-discriminating electorate lacks any basis in fact or logic. First, the legislative debates clearly demonstrate the above mentioned concern, not the purported confidence in fairminded voters. Second, the exact same kind of law retiring judges at 70 can keep elected judges from even postulating a candidacy, as well as appointed judges from remaining in their appointed positions. Third, it was the electorate itself which, by an even greater majority than that required to elect a judge, incorporated the mandatory retirement age into both the Massachusetts and Virginia constitutions.

monwealth under ADEA. In the second place, the other concerns expressed by the SJC go well beyond mere capacity to perform. The forced turnover may permit the appointment of judges that more closely reflect prevalent points of view, as well as the present societal makeup (and may even permit the state to redress past inequities). While these concerns may not be sufficient to make a certain age a bona fide occupational qualification for judges, they are still important state interests that are met by the constitutional age limit.

In any event, these are secondary considerations. Our interpretation of the statute is compelled principally by a respect for independent state government, which is not only a canon of construction as explained earlier, but was incorporated by Congress into the statute. We conclude, therefore, that Congress did not intend to apply the ADEA to appointed state judges, and affirm the decision of the district court.

AFFIRMED.