EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff–Appellee,

v.

STATE OF VERMONT, State Office of the Court Administrator, and State Department of Finance and Management, Defendants–Appellants.

No. 627, Docket 89–6178.

United States Court of Appeals, Second Circuit.

Argued Jan. 5, 1990.

Decided May 21, 1990.

---

Paul Bogas, E.E.O.C., Washington, D.C. (Charles A. Shanor, Gen. Counsel, Gwendolyn Young Reams, Associate Gen. Counsel, Vella M. Fink, Asst. Gen. Counsel, E.E.O.C., Washington, D.C., on the brief), for plaintiff-appellee.

William B. Gray, Burlington, Vt. (Paul D. Sheehey, Sheehey Brue Gray & Furlong, Burlington, Vt., on the brief), for defendants-appellants.

James M. Shannon, Atty. Gen. of the Com. of Massachusetts, Boston, Mass. (H. Reed Witherby, Asst. Atty. Gen., Boston, Mass., of counsel), filed a brief for amicus curiae Commonwealth of Mass. in support of defendants-appellants.

Clarine Nardi Riddle, Deputy Atty. Gen., and Acting Atty. Gen. of the State of Conn., Hartford, Conn. (Daniel R. Schaefer, Asst. Atty. Gen., Hartford, Conn., of counsel), filed a brief for amicus curiae State of Connecticut in support of defendants-appellants.

Joseph A. Morris, Chicago, Ill. (Peter G. Gallanis, Chicago, Ill., Robert S. Peeters, Peeters, Baird & Lax, Stamford, Conn., Hal Stratton, Atty. Gen. of the State of N.M., Santa Fe, N.M., of counsel), filed a brief for amici curiae Lincoln Legal Foundation and the State of N.M. in support of defendants-appellants.

Steven S. Zaleznick, Washington, D.C. (Cathy Ventrell–Monsees, Washington, D.C., of counsel), filed a brief for amicus curiae American Ass'n of Retired Persons in support of plaintiff-appellee.

Before KEARSE and WINTER, Circuit Judges, and LEVAL, District Judge.[*]

* Honorable Pierre N. Leval, of the United States District Court for the Southern District of New York, sitting by designation.

KEARSE, Circuit Judge:

Defendants State of Vermont, State Office of the Court Administrator, and State Department of Finance and Management (collectively the "State") appeal from so much of a final judgment of the United States District Court for the District of Vermont, Lee P. Gagliardi, *Judge*, as permanently enjoined the State from retiring Vermont Supreme Court Justice Louis P. Peck or any other appointed Vermont judge on the basis of age. The district court ruled that the State's enforcement of a Vermont constitutional provision requiring that judges retire at age 70 would, to the extent applied to appointed judges, violate the Age Discrimination in Employment Act, 29 U.S.C.A. § 621 *et seq.* (West 1985 & Supp.1990) ("ADEA" or the "Act"). On appeal, the State contends principally that the district court's decision is contrary to the ADEA and violates the Tenth Amendment to the Constitution of the United States. For the reasons below, we affirm the judgment.

## I. BACKGROUND

The Vermont Supreme Court is the court of last resort in the State of Vermont. It has five active justices, and its duties include exercising appellate jurisdiction in civil and criminal cases, administering Vermont's courts, and exercising disciplinary authority over judicial officers and attorneys in the state. *See* Vt. Const. ch. II, §§ 29–30. In exercising administrative control and disciplinary authority, the court adopts rules of practice and procedure, prescribes standards and adopts rules for the admission of persons to practice before the Vermont courts, adopts and promulgates a code of judicial ethics, and adopts disciplinary rules for the enforcement of codes and standards. The justices of the Vermont Supreme Court act independently of the appointing authority, and the court does not render advisory opinions. *See In re Opinion of the Justices*, 115 Vt. 524, 64 A.2d 169 (1949).

The Vermont constitution provides that supreme court justices, as well as all lower court judges except assistant judges and judges of probate, are to be appointed by the governor, with the advice and consent of the State Senate, from a list of candidates prepared by a judicial nominating body established by the General Assembly, Vt. Const. ch. II, § 32. At no time is an appointed justice or judge's selection or retention submitted to a vote of the general electorate. Appointments are for six-year terms and the justice or judge may remain on the bench for succeeding terms unless the General Assembly votes against his or her continued service. *Id.* § 34. For all judges and justices the Vermont constitution provides a mandatory retirement age of 70:

> All justices of the Supreme Court and judges of all subordinate courts shall be retired at the end of the calendar year in which they attain seventy years of age or at the end of the term of election during which they attain seventy years of age....

Vt. Const. ch. II, § 35.

Justice Peck was appointed to the Vermont Supreme Court by the Governor in 1981, and his appointment was confirmed by the State Senate in 1982. In 1987, in accordance with State constitutional and statutory procedures, Justice Peck was retained on the court for a further six-year term by the Vermont General Assembly. On December 24, 1988, Justice Peck reached the age of 70. He was scheduled to be retired on June 30, 1989, solely because of the state constitutional provision mandating retirement of supreme court justices at age 70.

In May 1989, Justice Peck filed an age discrimination charge with the Equal Employment Opportunity Commission ("EEOC" or the "Commission"), which led to the commencement of this suit by the EEOC on June 9, 1989. The complaint charged that the mandatory retirement provision of the Vermont constitution violated § 4(a) of the ADEA, 29 U.S.C.A. § 623(a). It sought a permanent injunction against application of the retirement provision, as well as monetary relief for Justice Peck and others adversely affected by the provision. The Commission moved for a

preliminary injunction to prevent Justice Peck from being retired. The State cross-moved for summary judgment dismissing the action, contending that the ADEA either was inapplicable to Vermont's appointed judges or, if applicable, violated the State's rights under the Tenth Amendment to the federal Constitution. The parties stipulated to the relevant facts; pursuant to Fed.R.Civ.P. 65(a)(2), the district court consolidated the hearing on the preliminary injunction motion with the trial on the merits.

In an Opinion and Order dated July 18, 1989, 717 F.Supp. 261, the district court ruled that Vermont judges are employees as that term is defined by § 11(f) of the Act, 29 U.S.C.A. § 630(f), and that Vermont's mandatory retirement provision, insofar as it is applicable to appointed judges, is prohibited by the ADEA. The court rejected the State's contention that this application of the ADEA violated the State's rights under the Tenth Amendment. Accordingly, the court denied the State's motion for summary judgment and granted a permanent injunction prohibiting the State from retiring Justice Peck or any other appointed judge on the basis of age. Since no other judge had been adversely affected by the provision, and Justice Peck had not yet been retired, the court denied the Commission's request for monetary relief. This appeal followed.

## II. DISCUSSION

On appeal, the State renews its contentions (1) that the ADEA does not cover Vermont judges, arguing that they fall within an exception to the Act's definition of covered employees, and (2) that if the ADEA was intended to cover Vermont judges, it violates the Tenth Amendment. For the reasons below, we reject both contentions.

### A. *The Reach of the ADEA*

The ADEA was enacted to "promote employment of older persons based on their ability rather than age." 29 U.S.C.A. § 621(b). Protecting employees over the age of 40, *see* 29 U.S.C.A. § 631(a), the Act forbids an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age," *id.* § 623(a)(1). The Act defines the term "employee," in pertinent part, as follows:

The term "employee" means an individual employed by any employer except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office.

*Id.* § 630(f).

There is no question that the State is an employer to which the Act applies and that Vermont's judges are employed by the State. Thus, the question is whether its appointed judges are within any group that § 630(f) excludes from the definition of "employee." Since these judges are neither elected officials, nor members of the appointing official's personal staff, nor advisors of the appointing official, they are protected by the ADEA unless they fall within the exception for "appointees on the policymaking level." Though the meaning of this part of the definition is not entirely clear, we conclude that both the framing of the exception as a whole and the pertinent legislative history indicate that Vermont's appointed judges do not fall within the exception.

The definition of "employee" excepts two broad groups from the protection of the Act. The first group is elected officials of a state or its political subdivisions; the second group is certain, though not all, of the persons appointed by those elected officials. The second group comprises three categories of such appointees: *i.e.*, (1) "person[s] chosen by such officer to be on such officer's personal staff," (2) "appointee[s] on the policymaking level" (sometimes referred to here, for convenience, as policy-

makers), and (3) "immediate adviser[s] with respect to the exercise of the constitutional or legal powers of the office." Bypassing for a moment the matter of whether judges may properly be deemed to make policy, we consider first whether the policymaker category was meant to comprise only those policymakers working closely with the elected official or whether it was meant to encompass also those operating wholly independently of that official.

■ The contents and structure of the exception suggest that Congress intended the more limited interpretation. Plainly, the first and third categories, *i.e.,* the elected official's personal staff and his immediate advisors, refer to persons who would work closely with the elected official, and we would infer that the middle category was intended to share basic characteristics of the categories that surrounded it. Had Congress intended to except a wide-ranging category of policymaking individuals operating wholly independently of the elected official, it would probably have placed that expansive category at the end of the series, not in the middle. Thus, though at least one court has reached the conclusion that the policymaker exception covers any person appointed to a policymaking level position, whether or not he works with or is answerable to the elected official, *see EEOC v. Massachusetts,* 858 F.2d 52, 56 (1st Cir.1988), we conclude that the language and structure of the definition of "employee" suggest that Congress meant the policymaker category to comprise only policymakers working closely with the elected official.

What little legislative history there is suggests that our narrower interpretation was what Congress intended. Though there is scant legislative history with respect to the definition of "employee" in the ADEA, we are aided by the fact that the ADEA was patterned after Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1982) ("Title VII"). See *Lorillard v. Pons,* 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978). Title VII, as amended in 1972 to extend its reach to governmental employers, uses a definition

of "employee," *see* 42 U.S.C. § 2000e(f), that is identical to the definition at issue here, which Congress adopted two years later in amending the ADEA. Accordingly, we look to .the legislative history of § 2000e(f)'s exceptions to the definition of "employee."

As originally enacted, neither Title VII nor the ADEA applied to states or municipalities. When these statutes were amended in 1972 and 1974, respectively, to make them applicable to governmental entities, the change was effected principally by adding those entities to the statutory definition of "employer." The Senate bill proposing expansion of Title VII, as originally drafted, would merely have expanded the term "employer" without changing the definition of "employee." Senator Ervin noted that the effect was to make the coverage extremely broad:

> The bill defines a State and political subdivision of a State as employers.... It defines an employee as one who is employed by an employer. The dictionary states that any person or concern which employs another, usually for wages or a salary, is an employer. Under these provisions, no one is excepted. In other words, the bill is broad enough in its present form to cover Governors of States, State supreme court justices, State legislators, and so forth.

118 Cong.Rec. 4096 (1972). Focusing principally on the fact that as thus fashioned, the bill would cover elected officials, Senator Ervin offered an amendment to exclude those officials and certain of their appointees. The evolution of the exception, from the first proposed version through its final version, is revealing.

Senator Ervin first proposed an amendment to exclude from the definition of "employee" only officials who were elected, plus the third of the appointee categories eventually excluded, *i.e.,* the legal and constitutional advisors. As Senator Ervin stated, his amendment was to provide that

> the term "employee" as set forth in the original act of 1964 and as modified by the pending bill shall not include any person elected to public office in any

State or political subdivision of any State by the qualified voters thereof, or any person chosen by such person to advise him in respect to the exercise of the constitutional or legal powers of his office.

*Id.* at 4483. This proposal was met with a suggestion by Senator Williams, manager of the bill, to expand the exception to still another category, the elected official's personal staff. Thus, Senators Williams and Ervin engaged in the following colloquy:

Mr. WILLIAMS.....

.... First, State and local governments are now included under the bill as employers. The amendment would provide, for the purposes of the bill and for the basic law, that an elected individual is not an employee and, threfore [*sic*], the law could not cover him. The next point is that the elected official would, in his position as an employ*er*, not be covered and would be exempt *in the employment of* certain individuals.

....

... [B]asically the purpose of the amendment ... [is] to exempt from coverage those who are chosen by the Governor or the mayor or the county supervisor, whatever the elected official is, *and who are in a close personal relationship and an immediate relationship with him.* Those who are his first line of advisers. Is that basically the purpose of the Senator's amendment?

Mr. ERVIN: I would say to my good friend from New Jersey that that is the purpose of the amendment.

118 Cong.Rec. 4492–93 (1972) (emphasis added). As a result, the language of Senator Ervin's proposed amendment was expanded to read, in pertinent part, that "employee" would not include an elected official " '*or any person chosen by such officer to be a personal assistant,* or an immediate adviser in respect to the exercise of the constitutional or legal powers of the office.' " *Id.* at 4493 (emphasis added). These amendments were adopted by the Senate, and the first and third categories of the statutory exclusion were added to the Senate bill.

In addition, Senator Javits had urged that further study be given to the scope of the "adviser" phrase. He stated:

When I was attorney general of New York, I had some 500 employees, some 200 of whom were lawyers and some 300 of whom were various functionaries, stenographers, subpena [*sic*] servers, researchers, and so forth.

I would like to have overnight to check into what would be the status of that rather large group of employees.

I realize that the Senator is seeking to confine it to the higher officials in a policymaking or policy advising capacity.

*Id.* at 4097. Later, Senator Javits renewed his emphasis on the need to exclude policymakers from the definition of "employee," stating as follows:

The other thing, the immediate advisers, I was thinking more in terms of a cabinet, of a Governor who would call his commissioners a cabinet, or he may have a cabinet composed of three or four executive officials, or five or six, who would do the main and important things. That is what I would define those things expressly to mean.

*Id.* at 4493. Senator Ervin responded that he thought the amended language made that scope clear, *id.*, and the Senate's proposed amendment to the definition of "employee" remained as fashioned by Senators Ervin and Williams—*i.e.*, expressly excluding only elected officials, their personal staff, and their immediate advisors on the powers of the office. Eventually, however, a conference committee made the policymaker exception explicit.

In conference, members of the House of Representatives, whose bill to amend Title VII had contained no modification of the definition of "employee," agreed to exclude from that definition the two categories of appointees described by the Senate's amended bill. In addition, the conferees agreed to add the policymaker category to the group of appointees to be excluded. Thus, the section that eventually became 42 U.S.C. § 2000e(f) was reported out of conference with an "amendment exempting, in addition to State and local govern-

ment elected officials, persons chosen by such officials to be on their personal staffs, *appointees of such officials on a policymaking level* or immediate advisors of such elected officials." Joint Explanatory Statement of Managers at the Conference on H.R. 1746, 92nd Cong., 2d Sess.1972, *reprinted in* 1972 U.S.Code Cong. & Admin.News ("USCCAN") 2137, 2179, 2180 ("Joint Explanatory Statement") (emphasis added). The conferees issued the following statement:

> It is the intention of the conferees to exempt elected officials and members of their personal staffs, and persons appointed by such elected officials as advisors or to policymaking positions *at the highest levels* of the departments or agencies of State or local governments, *such as cabinet officers*, and persons with comparable responsibilities at the local level.

Joint Explanatory Statement, 1972 USCCAN at 2180 (emphasis added). The Joint Explanatory Statement added, "It is the conferees [*sic*] intent that this exemption shall be construed narrowly." *Id.*

In sum, it was explicitly noted at the outset of the debates leading to the revision of the definition of "employee" that the original definition was broad enough to cover not only governors and legislators but also judges. After discussing the need to protect elected officials and their personal staffs, policymakers, and certain immediate advisors, Congress proceeded to except from the definition only those categories of persons. Apparently, after the first recognition that judges were within the original definition, the judiciary was never mentioned again, and there was no discussion indicating that Congress intended to place appointed judges in the excluded category of policymakers. Rather, the focus seems to have been on executive policymakers—hence the references in the legislative history to "cabinet officers" and appointees in the employment "of" elected officials—and the concern was to avoid casting the net too widely. We conclude that both the evolution of the exception and the direction that it be construed narrowly support our interpretation that by excluding appointees on the policymaking level, Congress meant to deny ADEA protection only to such appointees as would normally work closely with and be accountable to the official who appointed them.

■ Vermont's appointed judges do not come within the scope of the exception as thus construed. They are appointed by an elected official, the governor, but they do not advise her and are in no way answerable to her. The Vermont Constitution provides that

> [t]he Legislative, Executive, and Judiciary departments, shall be separate and distinct, so that neither exercise the powers properly belonging to the others,

Vt. Const. ch. II, § 5, and the Vermont Supreme Court itself has interpreted this provision as prohibiting it from furnishing the governor with advisory opinions. *See In re Opinion of the Justices*, 115 Vt. 524, 64 A.2d 169. The judges do not collaborate or work closely with the governor and cannot be deemed to be employed by her.

Thus, we conclude that Vermont's appointed judges are not excluded from coverage of the ADEA because the only excluded policymakers are those who work closely with the appointing authority.

■ We also conclude that appointed judges are not excluded from the ADEA's protection because, in our view, the performance of traditional judicial functions is not policymaking. The principal business of the courts is the resolution of disputes. In some cases, the courts resolve those disputes merely by applying established legal principles; in others, they must determine what legal principles apply when there is a lacuna in the law or determine how seemingly conflicting legal principles are to be reconciled. Even in the latter type of case, however, the courts are called upon primarily to fathom the nature and contours of policies established by the legislative and executive branches rather than to create or fashion new policy. Though such a judicial decision may thus state or clarify policy, any such statement or clarification is merely ancillary to the resolution of a particular controversy between par-

ties. We have seen no indication in the legislative history that Congress used the term "policymaking" with any intent to encompass a function that principally consists of dispute resolution rather than to confine that term to its ordinary meaning.

Further, even if we thought Congress intended to encompass dispute resolution under the rubric of policymaking, we would be hard pressed to view the exception in § 630(f) as applying to judges of the lower-level courts, for the exception extends to appointees on a policymaking "level." Though lower-court judges, like supreme court justices, are called upon at times to fill lacunae in the law, the lower court's decisions may be modified or reversed on appeal, may easily be overruled in another case, and may even be considered not binding on sister lower courts. *But see EEOC v. Massachusetts*, 858 F.2d at 56 (each judge, "no matter how lowly," is at the "top of his particular 'policymaking' chain of command, responding, if we can call it that, only to a higher appellate court"). We doubt that Congress meant "appointee[s] on the policymaking level" to apply to any judges, much less those who sit on courts not immune from reversals and conflicting decisions.

It is perhaps noteworthy that the judicial decisions of the Vermont Supreme Court indicate that that court likewise views the judicial function as being limited to the implementation of policies expressed by the state legislature, as contrasted with the creation or adoption of policy. *See, e.g., King v. Snide*, 144 Vt. 395, 479 A.2d 752, 756 (1984) ("[C]ourts are limited to the interpretation of statutes to effect the purpose expressed by the legislature which enacted them. If the main thrust of a statute seems unfair or unjust, the remedy must be sought in a legislative change."); *Sowma v. Parker*, 112 Vt. 241, 22 A.2d 513, 517 (1941) ("[I]t might have been fairer to have authorized a return [of the fee for a revoked license] but that was a matter of policy for the Legislature to determine and is no concern of ours.").

The view that the Vermont judges are not policymakers is apparently shared by the Vermont attorney general. He issued an opinion letter to Governor Madeleine Kunin and Justice Peck with respect to the applicability of the ADEA to Vermont's Supreme Court justices, stating as follows:

> While Supreme Court justices are frequently involved in weighing policy factors and rendering decisions with considerable policy implications, it is equally clear that their role in so doing is not ordinarily as the "makers" or "developers" of that policy, but primarily as the reviewers of the policies and decisions of others.

Op.Vt.Att'y Gen'l No. 87–8, at 3 (August 7, 1987). The attorney general's office reaffirmed this view following the First Circuit's contrary decision in *EEOC v. Massachusetts*, 858 F.2d 52. (*See* Letter from William Griffin, Chief Assistant Attorney General to Thomas J. Lehner, Court Administrator, Vermont Supreme Court, dated December 23, 1988.)

For all the above reasons, we conclude that judges are not properly viewed as persons "on the policymaking level" as that term is used in § 630(f) of the ADEA. We reach this conclusion notwithstanding the contrary views of the First Circuit in *EEOC v. Massachusetts*, 858 F.2d 52, and the Eighth Circuit in *Gregory v. Ashcroft*, 898 F.2d 598 (8th Cir.1990). Those courts reasoned, *inter alia*, that it was "nonsensical" to have appointed judges protected by the ADEA while elected judges are unprotected. The First Circuit also concluded that it was advisable to permit a state to "conserve a relatively young judiciary," since "Massachusetts does not wish to take up the perilous task of evaluating the performance of its older judges." *EEOC v. Massachusetts*, 858 F.2d at 57.

We are unpersuaded by these cases for several reasons. First, Congress presumably was aware that in some states judges are elected and in some they are appointed. It could easily have specified, had it so intended, that all judges (or that no judges) were to be considered "employee[s]," thereby eliminating any inconsistent treatment based on the manner of judicial selection.

It chose instead to except only elected officials and a narrowly defined group of appointees, leaving all other appointees covered by the Act. Any perceived imprudence in this dichotomy is a matter to be addressed to Congress.

Second, Congress enacted the ADEA precisely in order to permit older employees to be evaluated on their merits rather than simply on the basis of age. Thus, Congress has made the policy determination that employment decisions should be made on the very basis that Massachusetts is said to want to avoid. Under the Supremacy Clause, Congress's determination supersedes any state scheme to avoid decisions on an individual's merits by imposing an arbitrary retirement age.

Finally, Vermont apparently has no aversion to evaluating individual judges on their merits, for it has in place a procedure for making precisely such evaluations. Thus, any judge who files a declaration seeking to remain a judge after the expiration of his or her then-current term, must be evaluated by a committee of legislators for such characteristics as "integrity, judicial temperament, impartiality, health, diligence, legal knowledge and ability, and administrative and communicative skills," and overall judicial performance. Vt.Stat. Ann. tit. 4 § 608 (1988).

For all the foregoing reasons, we conclude that Vermont's appointed judges are employees within the meaning of the ADEA and are entitled to its protection.

B. *The Tenth Amendment Argument*

■ We also reject the State's contention that the Tenth Amendment precludes application of the ADEA to state-court judges. The Tenth Amendment, "[w]ith rare exceptions, ... does not carve out express elements of state sovereignty that Congress may not employ its delegated powers to displace." *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 550, 105 S.Ct. 1005, 1017, 83 L.Ed.2d 1016 (1985); *see South Carolina v. Baker*, 485 U.S. 505, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988). "State sovereign interests ... are more properly protected by procedural safeguards inherent in the structure of the federal system than by judicially created limitations on federal power." *Garcia*, 469 U.S. at 552, 105 S.Ct. at 1018. In *Baker*, the Court observed that "where ... the national political *process* did not operate in a defective manner, the Tenth Amendment is not implicated." 485 U.S. at 513, 108 S.Ct. at 1361 (emphasis in original).

Vermont cannot meet this standard. No showing has been made that the "national political process" involved in enacting the ADEA was in any way defective. The original statute and its amendments apparently received plenary consideration in Congress, as did the Title VII provisions that became the model for the provision at issue here. Though the State informs us that Vermont's senators were absent from the debate on the Title VII extension and argues that their absence somehow tainted the legislative process, we regard that argument as frivolous. There is no suggestion that Congress surreptitiously enacted any legislation without notice to the State of Vermont. Indeed, we note that Senator Stafford of Vermont was one of the managers of the Senate bill to amend Title VII. *See* Joint Explanatory Statement, 1972 USCCAN at 2186. In any event, the absence of a given legislator or legislators, so long as the legislative body's appropriate procedural rules have been followed, does not mean that the national process leading to the enactment of a given piece of legislation was flawed. The *Garcia–Baker* standard is a very high one, and the State has not come close to meeting it.

### CONCLUSION

We have considered all of the State's arguments on this appeal and have found them to be without merit. For the foregoing reasons, the judgment of the district court is affirmed.